AMENDED
LIMITED OFFERING MEMORANDUM
**CONFIDENTIAL NO._____**
**OFFERING MEMORANDUM**

$1,000,000
**MyCareCoach, LLC**
(A Florida Limited Liability Company)
250 UNITS @ $4,000 PER UNIT
(3) Unit Minimum Subscription

---

MyCareCoach, LLC (the "Company") is a Florida limited liability company which intends to provide a comprehensive integrated technology and communications platform for chronic case management for Medicare patients. The Manager of the Company is Mr. Bob Talbot (the "Manager").

Each membership unit requires a Capital Contribution of $4,000. Membership Interests will receive Distributions in accordance with the Operating Agreement attached as Part C to this Offering Memorandum

**The Manager has virtually total managerial powers over the Company; investors will not have the right to approve most of the Manager's decisions.**

**This investment involves substantial risks (See "Risk Factors"). Interests may be purchased only by Accredited Investors (See "Who May Invest").**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the sale of Interests, or determined if this Memorandum is truthful or complete. Any representation to the contrary is a criminal offense.**

**The Interests have not been registered under the Securities Act of 1933, as amended (the "Act"), the Securities Act of USA or the securities laws of any other jurisdiction, relying on exemptions from registration provided by Sections 3(b), 4(2) and 4(6) of the Act, Regulation D and other comparable exemptions.**

**MyCareCoach, LLC**
8374 Market Street
Suite 472
Lakewood Ranch, FL 34202
The date of this Memorandum is 01/18/2015



EXHIBIT
"A"

## CONFIDENTIALITY AGREEMENT

I acknowledge and agree that:

I may not reproduce this Offering Memorandum in whole or in part, distribute it to any person, or divulge any of its contents other than to my investment advisors, without the prior written consent of the Manager.

By accepting delivery of this Offering Memorandum, I agree to return the Offering Memorandum, including each of its parts, and all other documents relating to the Company, to the Manager if I do not purchase any of the Units offered.

---

## RISK FACTORS; LEGENDS

The Offering of the membership units ("Unit" or "Units") and operation of the Company involve several actual and potential conflicts of interest.

The Company is recently formed and has no operating history. The Company will not own any real estate, but intends to lease office space for its operations to be located in Florida, USA.

There is no public market for the Units or Membership Interest, nor is such a market expected to develop.

Securities laws and the Operating Agreement severely restrict the transferability of the Units and Membership Interests.

We give no legal or tax advice to prospective investors in this Memorandum. Each investor should consult his own counsel and accountant as to the legal, tax and other matters concerning this investment.

No person is authorized to give any information or to make any representations other than those contained in this Offering Memorandum, and you must not rely on any information not set forth in this Offering Memorandum. This Offering Memorandum is not an offer or solicitation in any jurisdiction in which such an offer or solicitation may not legally be made. The statements in this Offering Memorandum are made as of its date.

Each prospective purchaser and his advisors, if any, are encouraged to ask questions of, and receive answers from, the Manager concerning the terms and conditions of this Offering Memorandum and to obtain additional information, to the extent possessed or obtainable without unreasonable effort or expense, necessary to verify the accuracy of the information in this Offering Memorandum.

# TABLE OF CONTENTS

PART A -- SUMMARY ................................................................................................7

Forward-looking Statements ...................................................................................10

Risk Factors............................................................................................................10

Use of Proceeds......................................................................................................15

Business..................................................................................................................15

Employees ..............................................................................................................16

Company Ownership...............................................................................................16

The Manager ...........................................................................................................16

Fiduciary Responsibility of the Manager and Its Members ....................................16

Manager Compensation..........................................................................................16

CDO Compensation................................................................................................17

Conflicts of Interest................................................................................................17

Tax Aspects ............................................................................................................17

Summary of the Operating Agreement ...................................................................17

Term .......................................................................................................................17

Members..................................................................................................................17

Capital Contributions; No Assessments .................................................................18 17

Management.............................................................................................................18

Account Statements.................................................................................................18

Transfers..................................................................................................................18

Liquidation and Final Distribution ..........................................................................18

Other Businesses ....................................................................................................18

Maintaining Property...............................................................................................18

Limitation on Manager's Liability ............................................................................18

Liability of Members................................................................................................19 18

Voting Rights of Members .......................................................................................19

Description of the Units ...........................................................................................19

General ...................................................................................................................19

Members' Return .....................................................................................................20 19

Distributions............................................................................................................20

Allocation of Net Income and Net Losses...............................................................20

Terms of the Offering...............................................................................................20

How to Subscribe ...................................................................................................21 20

Limited Offering ......................................................................................................21

Who May Invest ......................................................................................................21

Litigation .................................................................................................................22 21

Legal Matters ..........................................................................................................22

| | Additional Information | 22 |
|---|---|---|
| | No Financial Statements | 22 |
| **PART B – BUSINESS PLAN** | | 23 |
| **PART C – OPERATING AGREEMENT** | | 24 |
| 2.01 | Formation | 30 |
| 2.02 | Name | 30 |
| 2.03 | Principal Place of Business | 30 |
| 2.04 | Registered Office and Registered Agent | 30 |
| 2.05 | Duration | 31 |
| 3.01 | Purpose | 31 |
| 4.01 | Members | 31 |
| 4.02 | Dissociation | 31 |
| 5.01 | Management | 31 |
| 5.02 | Number, Tenure, Qualifications and Election | 31 |
| 5.03 | Specific Powers | 31 |
| 5.04 | Members Have No Authority to Bind | 32 |
| 5.05 | Liability | 32 |
| 5.06 | Nonexclusive Relationship | 32 |
| 5.07 | Related Party Transactions | 33 |
| 5.08 | Bank Accounts | 33 |
| 5.09 | Indemnification | 33 |
| 5.10 | Resignation | 33 |
| 5.11 | Removal | 33 |
| 5.12 | Vacancy | 33 |
| 5.13 | Compensation | 33 |
| 5.14 | Confidentiality | 33 |
| 6.01 | Limitation of Liability | 33 |
| 6.02 | Company Debt | 33 |
| 6.03 | List of Members | 33 |
| 6.04 | Sale of Assets | ~~33~~ 34 |
| 6.05 | Sale or Licensing of Intellectual Property | 34 |
| 6.06 | Access to Records | 34 |
| 6.07 | Priorities Among Members | 34 |
| 6.08 | Liability of a Member of the Company | 34 |
| 6.09 | No Participation in Management | 34 |
| 7.01 | Meetings | 34 |
| 7.02 | Place of Meetings | 34 |
| 7.03 | Notice of Meetings | 34 |

7.04    Meeting Without Notice..................................................................34
7.05    Record Date ...............................................................................34
7.06    Quorum ......................................................................................34
7.07    Manner of Acting........................................................................35
7.08    Proxies.......................................................................................35
7.09    Action by Members Without a Meeting.......................................35
7.10    Waiver of Notice.........................................................................35
7.11    Voting.........................................................................................35
7.12    Appearance at Member Meetings ..............................................35
8.01    Member's Initial Capital Contribution ........................................35
8.02    Additional Capital Contributions ...............................................35
8.03    Capital Accounts........................................................................3736
8.04    Withdrawal or Reduction of Member's Contributions to Capital......37
9.01    Allocations of Profits and Losses ..............................................37
9.02    Special Allocations to Capital Accounts.....................................38
9.03    Distributions...............................................................................40
9.04    Limitations Upon Distributions ..................................................40
9.05    Accounting .................................................................................40
9.06    Interest on and Return of Capital Contributions.........................40
9.07    Loans to Company .....................................................................40
9.08    Accounting Period.......................................................................40
9.09    Maintenance of Records.............................................................40
9.10    Tax Returns ...............................................................................4140
9.11    Tax Information ...........................................................................4140
9.12    Tax Matters Partner....................................................................41
10.01   Deadlock.....................................................................................41
10.02   Mediation....................................................................................41
10.03   Binding Arbitration......................................................................41
11.01   Agreed Value...............................................................................41
12.01   Limitation on Transferability ......................................................42
12.02   Transfer Notice...........................................................................42
12.03   Company Right of First Refusal..................................................42
12.04   Member Right of First Refusal....................................................4342
12.05   Involuntary Transfer ...................................................................43
12.06   Lifetime Gifts..............................................................................43
12.07   Prohibited Transfers ...................................................................43
12.08   Status of Transferee....................................................................4443
12.09   Costs...........................................................................................4443

13.01    Additional Members...........................................................................................44
14.01    Events of Dissolution........................................................................................44
14.02    Liquidation and Distribution..............................................................................44
14.03    Articles of Dissolution.....................................................................................4544
14.04    Filing of Articles of Dissolution.......................................................................4544
14.05    Return of Capital Contribution and Nonrecourse to Other Members ...................45
15.01    Notices.............................................................................................................45
15.02    Books of Account..............................................................................................45
15.03    Applicable Law and Venue................................................................................45
15.04    Waiver of Action for Partition ........................................................................4645
15.05    Amendments ..................................................................................................4645
15.06    Additional Documents .....................................................................................4645
15.07    Construction ...................................................................................................4645
15.08    Headings .........................................................................................................4645
15.09    Default Waivers...............................................................................................4645
15.10    Rights and Remedies Cumulative ....................................................................46
15.11    Severability .....................................................................................................46
15.12    Successors and Assigns ...................................................................................46
15.13    Creditors...........................................................................................................46
15.14    Counterparts.....................................................................................................46
15.15    Integration .......................................................................................................46
15.16    Interpretation ...................................................................................................46
15.17    Incorporation of Exhibits .................................................................................46
PART D – SUBSCRIPTION DOCUMENTS .................................................................5352

## PART A --- SUMMARY

The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information included elsewhere in this Memorandum, including all of its parts (the "Memorandum"), and other information which the Manager may provide at the request of a potential investor.

### The Company

MyCareCoach, LLC (the "Company") is a limited liability company organized under Florida law to provide a comprehensive integrated technology and communications platform for chronic case management for Medicare patients, to be known as MyCareCoach, LLC ("MyCareCoach").

| | |
|---|---|
| **Company Objectives:** | The Company intends to design, develop and deploy an integrated technology platform designed to provide chronic case management for the Medicare patient population with two or more chronic conditions.  The Company's objectives are to (i) return the Members' capital, and (ii) provide the Members with periodic cash distributions from operations. No assurance can be given that any of these objectives will be achieved. See "Investment Objectives and Policies." |
| **Company Business:** | |
| **MyCareCoach:** | MyCareCoach will lease dedicated "Private Cloud" servers and enterprise Microsoft applications including MS SharePoint, MS CRM, MS SQL, MS Server and MS Active Directory from HIPPA secure vendors.  These servers will be leased from reputable vendors with high levels of security and available bandwidth to ensure high availability access and security. |
| | In addition, we plan to lease office space for our management team in Florida and Illinois for use by our chronic case management employees and IT Staff.  We plan on leasing approximately 12,000 sq. ft. for this purpose. |
| | Our new leased facilities may include general office space, classroom space and a clinical lab area for hands on chronic case management training. |
| *Real Property Lease;* | MyCareCoach will be located in leased facilities in the states of Florida and Illinois USA. |
| *Manager;* | The Manager will be responsible for overall operations of MyCareCoach with the Managers main focus on the Sales and Marketing operation of MyCareCoach.  The Manager intends to delegate to the Chief Development Officer (CDO) to employ the required employees and contractors to design, develop and deploy our integrated technology platform.  In addition the Manager will delegate to the Chief Operating Officer (COO) all day to day operations of MyCareCoach to hire and coordinate the required personnel and activities necessary to promote MyCareCoach training programs, including patient enrollment, HR Staff, AP/AR, Customer Service financing activities, etc....  We anticipate using sophisticated web marketing activities to facilitate our objectives. |
| | The Manager, CTO and COO will receive monthly compensation as defined in the business plan. |

**The Offering**

| | |
|---|---|
| **Form of Offering:** | The Units are privately offered pursuant to exemptions from registration afforded by Section 4(2) of the Securities Act of 1933, as amended, and Regulation D adopted thereunder. |
| **The Units; Capital Contributions; Equity Ownership:** | The Company will offer to Qualified Accredited Investors an = Offering of two hundred and fifty Membership Units. Each Unit will have a Capital Contribution of $4,000 and each investor must purchase a minimum of three (3) Units for $12,000. Membership Interests will have limited voting rights. See "Description of the Units." |
| **Allocations and Distributions:** | Allocations & Distributions of Net Profits and Net Losses are defined in the Operating Agreement attached as Part C of this Offering Memorandum.  As a general rule, the Company intends to make Distributions to Members not less frequently than semi-annually. The Manager will determine the adequacy of reserves, which it intends to maintain in line with industry standards, and the amount of any Distribution. |
| **Offering Price; Subscription Period:** | Each investor must purchase at least 3 Units for $12,000 ($4,000 per Unit), although the Manager reserves the right to accept less than the minimum subscription. The Offering of Units will terminate on or before 03/31/2015, unless extended one or more times by the Company, without notice to subscribers, to a date not later than 05/30/2015. Units must be purchased for cash. Each person wishing to purchase Units must complete and execute a Subscription Agreement and deliver it to the Manager. |
| **Plan of Distribution:** | The Manager will use its "best efforts" to sell the Units offered; neither the Manager nor its affiliates will receive any compensation, directly or indirectly, relating to the Offering. There can be no assurance that any or all of the Units will actually be sold. The Company will not enter into selling agreements with registered broker-dealers for the sale of units. |
| **Anticipated Use of Proceeds** | The Company will use proceeds of the Offering, less expenses, to design, develop and deploy the MyCareCoach chronic case management portal, lease the required MyCareCoach office space and related improvements, conduct a marketing program and promote MyCareCoach and for general business purposes. All expenses in connection with this Offering, including among other expenses, printing, mailing and marketing expenses and legal and accounting fees, will be paid by the Company from Offering proceeds. See "Use of Proceeds." |
| **Temporary Investments:** | The Company may invest the net proceeds of the Offering in temporary investments, including short-term government securities, until funds are needed for business operations or operating expenses. |

**Risk Factors**

An investment in the Units is speculative and subject to a high degree of risk. The risks of an investment in the Company are described in detail under "Risk Factors" beginning at page 5. Those risks include, but are not limited to:

- The Company intends to engage in the business of chronic case management and developing and operating MyCareCoach as an integrated technology platform that meets or exceeds all

regulations defined by Medicare for this purpose.   As the business is a start-up venture; the business poses many risks;

- The Company is newly formed, and has no operating history;

- Lack of liquidity (possible inability to transfer or liquidate Units);

- Compliance with all State and Federal regulatory requirements;

- Obtaining all necessary accreditations, licensures and permits as may be required by State and Federal governmental agencies.

**Additional Information**

If you want more information, contact the Manager as follows:

Mr. Bob Talbot
8374 Market Street
Suite 472
Lakewood Ranch, FL 34202

At your request, the Manager will allow you to review documents or information referred to in this Memorandum. See "Additional Information."

**Forward-looking Statements**

Some of the statements contained in this Memorandum, including information incorporated by reference, discuss future expectations, contain projections of results of operation or financial condition or state other "forward-looking" information.  Those statements are subject to known and unknown risks, uncertainties and other factors, certain of which are beyond the Company's control, which could cause the actual results to differ materially from those contemplated by the statements. The forward-looking information is based on various factors and was derived using numerous assumptions. In light of the risks, assumptions, and uncertainties involved, there can be no assurance that the forward-looking information contained in this Memorandum will in fact transpire or prove to be accurate.

Important factors that may cause the actual results to differ include, for example,

- the Company's ability to generate new customers as discussed in the business plan;

- the Company's ability to design, develop and deploy our comprehensive integrated technology platform for use by MyCareCoach on terms and conditions acceptable to the Company;

-  the success or failure of the Manager's efforts to design, develop and deploy MyCareCoach on schedule;

- the Company's ability to attract, build and maintain a Medicare patient population with 2 or more chronic conditions;

- the Company's ability to attract and retain employees;

- the effect of changing economic conditions;

- the ever changing regulatory landscape;

- other risks which are described under "Risk Factors" and which may be described in future communications to the Members.  The Company does not promise to update forward-looking information to reflect actual results or changes in assumptions or other factors that could affect those statements.

**Risk Factors**

An investment in the Company is speculative, and should be considered only by those persons who are able to afford to lose their entire investment. You should carefully consider the following risks in evaluating the Company and its proposed business before purchasing Units.

| No Company History | The Company is recently formed, and consequently has no operating history. |
|---|---|
| **Risks of Operation** | |
| *General risks* | The business of designing, developing and deploying an integrated technology platform for the chronic case management marketplace is subject to numerous inherent risks, including adverse changes in general or local economic conditions, and other operating expenses, governmental rules and fiscal policies and other factors beyond the control of the Manager. Although the Company intends to obtain comprehensive general liability insurance coverage for MyCareCoach, certain losses, such as catastrophic events, may be uninsurable, not economically insurable, or exceed the Company's limits for coverage. |
| *Competition* | As with all businesses, the chronic case management market will become very competitive, and there are other organizations that will compete with MyCareCoach for chronic case management.  There is no assurance that MyCareCoach will be able to compete successfully in any or all of these areas.  In addition, when compared to investments generally, a technology platform designed and developed for chronic case management may pose higher |

levels of risks for the unsophisticated investor. Numerous factors will determine success or failure of MyCareCoach, including the technology platform to be used, the overall concept, and the skill and experience of its management. The success of our program is subject to trends in the healthcare industry and changes in public opinion and taste which are unpredictable and subject to change. Since MyCareCoach will be developed as the first integrated chronic case management program to implement the Company's own concept, its results are speculative. For example, events not within the control of the Company, such as a change in healthcare industry requirements to which the Company does not respond, negative publicity with respect to chronic case management programs, or other factors could have a material adverse effect on the profitability of MyCareCoach. Although the Manager believes that MyCareCoach concept will be attractive to the public, we cannot assure you that MyCareCoach will succeed.

**Limited Capital**

A significant portion of the proceeds of this Offering will be used to design, develop and deploy the integrated technology platform to be offered by MyCareCoach and to pay initial promotional costs. See "Use of Proceeds" and "Business Plan." We cannot assure that the portion of Offering proceeds to be set aside for working capital purposes, together with cash from the operation of MyCareCoach, will be sufficient to support MyCareCoach, or that additional funds will be available at all or on terms, including interest rates, favorable to the Company.

**Limited Liability**

Members are generally not personally liable for obligations of a limited liability company in excess of the sum of their capital contributions. However, Members may be required to return an amount not in excess of the capital returned to them (with interest) if necessary to discharge the claims of creditors who extended credit to the Company prior to the return of such capital.

**Financial Projections**

The financial projections included in the Business Plan, which is referenced herein as Part B to this Memorandum, were prepared by the Manager, based on information and assumptions believed to be reasonable. The projections were not compiled, reviewed or audited by independent certified public accountants. Those projections reflect only the Manager's current expectation of likely results. There will be differences between projected results and actual results, because events and circumstances frequently do not occur as expected, and differences can be material. Projected benefits to Members may also vary and there can be no assurance that the results shown in the attached projections will be realized in whole or in part. Neither the Company's Manager, it's Members nor their affiliates or professional advisers guarantee or warrant the projected results. Projections are "Forward Looking" Information. See "Forward Looking Statements."

**Governmental Regulation**

The Company's business activities will be subject to the jurisdiction of a variety of regulatory authorities, including federal, state, county and municipal agencies administering laws and regulations relating to education, health, labor, and

taxation. There can be no assurance that the certifications and licenses needed for the operations of MyCareCoach can be obtained or maintained.

**Dependence on Manager and Center Manager**

As detailed in the MyCareCoach Business Plan, a COO will be hired by the Manager to oversee the day-to-day operations of MyCareCoach. The inability of the Manager to hire and retain a qualified administrator, particularly during our early development, could have a material adverse impact on the Company. The Manager will devote a significant portion of his time to the operations of MyCareCoach. See "The Manager."

**Dependence on Medicare Reimbursement**

We expect that the majority of the Company's revenues will be derived (indirectly) from Medicare reimbursement for patients that have enrolled in chronic case management programs developed by MyCareCoach. Healthcare is a competitive industry, and we cannot assure investors that we will successfully compete in the field.

**Control by, and Reliance on, the Manager and its Members**

All decisions with respect to the management of the Company will be made exclusively by the Manager. Members will have extremely limited rights and powers to take part in the management of the Company. No person should purchase Units unless he or she is willing to entrust all aspects of the management of the Company to the Manager, including the ability to hire and supervise the employees of MyCareCoach (even though with respect to certain types of management decisions the Manager or its members may have interests that conflict or compete with those of the Company), and has evaluated the Manager's capabilities to perform such functions. See "Conflicts of Interest," and "The Manager."

**Trademarks and Service Marks**

The Company has completed the design and development process for the logos and service marks to identify MyCareCoach and its services. Currently the Company has not completed trademark or service mark applications, and there can be no assurance that the Company will be able to utilize or legally protect any particular distinctive logos or service marks.

**Conflicts of Interest**

*Compensation from the Company.*

The Manager will realize certain compensation as described in the business plan irrespective of the overall profitability of the Company. Fees payable to the Manager, while believed by the Manager to be not more than normal and customary, have not been the result of arm's length negotiations. See "Use of Proceeds," "Manager Compensation" and "Conflicts of Interest."

*Other Ventures.*

The Manager and its members in the future may be engaged in the chronic case management industry for their own accounts and for others; however, they have agreed not to be involved in a similar business in those market areas served by MyCareCoach. Furthermore, the members of the Manager are required to devote only so much of their time to the business of the Company as they, in their sole discretion, deem advisable, subject to their fiduciary duties. See "Conflicts of Interest" and "Description of the Units – Other Benefits."

| | |
|---|---|
| **Return of Distributions** | Except as provided under the Operating Agreement or by law, a Member will not be personally liable for any debts or losses of the Company beyond the amount of his Capital Contribution and profits attributable to the Member remaining in the Company, if any. The Operating Agreement prohibits the Company from making any distribution to a Member to the extent that at the time of the distribution and after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the assets of the Company. The liability described above will not affect any obligation or liability of a Member under the Operating Agreement or other applicable law for the amount of a distribution. |

**Offering Risks**

| | |
|---|---|
| ***"Best Efforts" Private Placement; No Underwriter*** | The Units are being offered for sale by the Manager on a "best efforts" basis. No assurance can be given that the Manager will be able to sell all of the Units, in which case funds may be at a greater risk than if the Maximum Offering were sold. See "Use of Proceeds" and "Terms of the Offering." |
| ***Arbitrary Offering Price.*** | There is no market for the Company's Units, and the price of the Units offered bears no relationship to the assets, book value, net worth or any other recognized criteria of value of the Company. The offering price of the Units was determined arbitrarily by the Manager, and should not be considered as an indication of the actual value of the Company. In determining the offering price, the members of the Manager considered, among other things, the development stage of the Company, its limited financial resources, and the risk of investing in the Company. |
| ***Lack of Transferability of Interests.*** | The Interests offered are not, and are never intended to be, freely transferable. The Membership Interests have not been registered with the Securities and Exchange Commission, the Securities Division of the USA Corporation Commission, or under any other state "blue sky" laws. No transfer of Membership Interests may be made beyond what is allowed for by the Operating Agreement. Furthermore, counsel for the Company must receive a satisfactory opinion that any proposed transfer is not inconsistent with the requirements of applicable federal and state securities laws. It is not anticipated that any market for the Units or Interests will develop, or that the holders of Units or Interests will be able to readily liquidate their investments in the event of an emergency or for other reasons. Interests should be purchased only as a long-term investment. |
| ***Private Placement Exemptions.*** | Interests in the Company are being offered to investors pursuant to the private placement exemptions from registration provided in the Securities Act of 1933, as amended, and the regulations promulgated thereunder. If the Company should fail to comply with the requirements of such exemptions, the Members would have the right to rescind their purchase of Interests if they so desired. This might also occur under the applicable state securities law or |

laws in those states where Interests may be offered without registration under a private placement or other exemption. If a number of Members were to successfully seek rescission, the Company would face severe financial demands which could adversely affect the Company as a whole and, thus, the non-rescinding Members.

**Tax Risks**

*Extent of Tax Liability.*

In any taxable years in which the activities of the Company generate income in excess of deductible expenses, a Member will be required to report his share of income on his personal income tax return even though during such year he may have received no Distributions, or Distributions in an amount less than the amount of income which he is required to report. Accordingly, a Member may be required to pay income taxes with respect to income or gain allocated to such Member, even though the Member received no or a limited cash distribution with respect to such income or gain.

*No Guarantee of Tax Benefits*

The Manager anticipates that certain tax benefits, such as deductible indebtedness, may be available to Members. However, the Company does not intend to obtain an expert opinion or advance ruling from the IRS as to any tax benefits, and cannot guarantee that any tax benefits will be available to any investor.

*Complexity of Tax Treatment.*

The Company has been formed as a limited liability company under Florida law, and the Manager intends that the Company will be taxed as a partnership and the Members as partners. Federal income taxation of partners and partnerships is complex and is subject to possible modification by legislative, judicial and administrative action. There can be no assurance that the present federal income tax treatment of an investment in the Company may not be modified or eliminated by legislative, judicial or administrative action at any time. Any audit of the Company's information returns or the audit of any Member's tax return may lead to audit of the return of other individual Members.

*Nature of Investment;*

The current deductibility by a Member of his allocable share of Company indebtedness, if any, or other items of loss or expense, will depend on the characterization of the Company's activities. The Company is designed to generate income from operating MyCareCoach. The characterization of the Company's activities as investment activities, or as a trade or business is a factual determination based on all relevant facts and circumstances. Accordingly, each potential investor should confer with his individual tax adviser to determine whether, and to what extent, the investment interest limitations and limitations on losses from passive activities will apply with respect to an investment in the Company.

*Members' Tax Returns.*

The federal income tax information sent to each Member by the Company following the close of each calendar year will be based in certain cases on interpretations of data compiled from the books and records of the Company. The Manager will endeavor in good faith to adhere to current income tax regulations, interpretations and precedents and will consult with independent public accountants and tax

counsel to the extent deemed appropriate by the Manager in compiling the tax information to be sent to the Members. However, the amounts of income, gain, loss, deductions, credits or allowances reported by each Member for his individual income tax returns on the basis on such tax information might, in the event of an audit, vary from the amounts ultimately determined or allowed by the IRS or by the courts.

*No Ruling: No Formal Opinion of Counsel.*

The tax and economic benefits anticipated to be derived from an investment in Units depend, in part, upon the Company being treated as a partnership for federal income tax purposes rather than as an association taxable as a corporation. Under current regulations, the Manager will file an election to be taxed as a partnership; however, the Manager will not seek either a formal opinion of counsel or a ruling from the IRS regarding whether the Company will be treated as a partnership rather than as an association. Classification of the Company as an association for tax purposes would materially adversely affect the economic consequences of an investment in the Company.

Investors must look to their own tax advisors regarding the tax implications inherent in the Company and its operation, the income, deductions or tax credits which may be generated by the Company, and the impact the investment will have on their personal tax situations. No tax advice is given in this Memorandum.

## Use of Proceeds

The Company intends to utilize the proceeds of this offering in accordance with the outline as discussed in the Business Plan (attached as Part B).

(1)     The offering of the Units is being made by the Manager on a "best efforts" basis. The Manager will not receive any commissions or other compensation relating to the sale of Units. The Company will not enter into Selling Agreements with licensed securities dealers.

(2)     All expenses of the offering and first calendar year of the operation, including those for accounting, printing, legal, software development and other fees, and costs in connection with the organization and operation of the Company (estimated at $1,000,000), will be paid by the Company from Offering proceeds. The Offering will terminate on or before 10/01/2015 unless extended one or more times by the Company, without notice to subscribers, to a date not later than 12/31/2015 (the "Termination Date"). The Manager may subscribe for Units in this Offering, but they have no obligation to do so. If, at any time prior to the Termination Date, subscriptions have been received for less than a total 30 Units and accepted by the Company (which may include subscriptions from the Manager), then the Company may have an initial closing with respect to such accepted subscriptions and continue the Offering until the maximum offering of $1,000,000 is sold, or until the Termination Date, whichever first occurs. If, by the Termination Date, subscriptions for the required 30 Units have not been received and accepted by the Company, the Offering will be terminated and all subscription proceeds will be promptly returned to subscribers, without interest or deduction. Until the entire Offering has been subscribed for and accepted by the Company, all subscription proceeds will be held in an escrow account established by the Company at a financial institution.

## Business

Information regarding the proposed activities of the Company is contained in Part B of this Memorandum, "Business Plan." Other, more detailed, information may be obtained from the Manager. Additional documents may be reviewed by contacting the Manager.

Government Regulations

MyCareCoach will be subject to the jurisdiction of a variety of regulatory authorities, including federal, state, county and municipal agencies administering laws and regulations relating to education, healthcare, labor, and taxation. While the Company does not anticipate any difficulties in obtaining and

maintaining all necessary licenses, certifications and permits for the operation of MyCareCoach, there can be no assurance that all necessary licenses, certifications and permits for MyCareCoach can be obtained or maintained.

**Employees**

The Company anticipates that it will hire employees in accordance with the business plan (Attached and referenced herein as Part B).

**Company Ownership**

See Operating Agreement (Part C) for details of Company Ownership:

**The Manager**

The Company is managed by its Manager, Mr. Bob Talbot, which has the power to make virtually all business decisions for the Company. However, the consent of the Manager and a majority or more of the Members' Interests will be required in order to (i) sell, lease, exchange, encumber, or dispose of all or substantially all of the Company's assets, or merge the Company with or into another entity; (ii) do any act which will make it impossible to carry on the ordinary business of the Company or to materially change the business of the Company; or (iii) amend the Company's Articles of Organization, except in certain circumstances more particularly described in the Operating Agreement. A vote of eighty-five percent (85.0%) of all Percentage Interest is required to remove the Manager and a vote of eighty percent (80.0%) of all Percentage Interest is required to elect a successor manager.

Information about each of the members of the Manager is contained in the Business Plan.

**Fiduciary Responsibility of the Manager and Its Members**

The Manager and its members are accountable to the Company as fiduciaries and consequently must exercise good faith and integrity in handling Company affairs. The Operating Agreement provides that no Manager will have any liability to the Company for a mistake or error of judgment or for any act or omission believed to be within the scope of authority conferred on it by the Operating Agreement unless such mistake, error of judgment or act or omission was made, performed or omitted by such Manager fraudulently or constituted gross negligence or breach of fiduciary duty. The Operating Agreement also provides for indemnification of the Manager and its members by the Company for certain liabilities which the Manager incurs in dealings with the Company and third parties on behalf of the Company. To the extent that the indemnification is for liabilities arising under the Securities Act of 1933, in the opinion of the Securities and Exchange Commission, such indemnification is contrary to public policy and is, therefore, unenforceable.

The Manager has broad discretionary powers to manage the business and affairs of the Company. Generally, actions taken by the Manager are not subject to a vote or review by the Members except to the extent provided in the Operating Agreement.

**Manager Compensation**

The Manager will receive compensation as follows:

*Management Fee.* The Manager will receive a commission of $0.50 for each monthly patient life processed with monthly commission capped at $15,000 while serving as Manager as defined in the business plan attached to and referenced herein as "Part B" of this Offering Memorandum

*Equity Interest.* The Manager holds one-hundred and fifteen Units which equates to nineteen point one seven percent (19.17%) of the Membership Interest in the Company and under the terms of the Operating Agreement is entitled to nineteen point one seven percent (19.17%) of the Net Profits and nine percent (9%) of the Net Losses of the Company.

*Expenses.* The Manager will be reimbursed for its direct reasonable business expenses incurred for the benefit of the Company.

*Development Fee.* The manager will not be paid any development fees from the Company. Compensation for services provided in connection with the services rendered to the Company in connection with planning, supervising and completing construction of MyCareCoach will be paid in the form on Membership Units as defined above in Equity Interest.

The Chief Development Officer (CDO)

**CDO Compensation**

The CDO will receive compensation as follows:

*CDO Fee.* The CDO will receive compensation of $10,000 for each month starting July through August 2015 and capped at $15,000 per month starting Sept 2015 while serving in the position of CDO as defined in the business plan attached to and referenced herein as "Part B" of this Offering Memorandum

*Equity Interest.* The CDO holds one-hundred and sixty-five Units which equates to twenty-seven point five percent (27.5%) of the Membership Interest in the Company and under the terms of the Operating Agreement is entitled to twenty-seven point five percent (27.5%) of the Net Profits and thirteen percent (13%) of the Net Losses of the Company.

*Expenses.* The CDO will be reimbursed for its direct reasonable business expenses incurred for the benefit of the Company which are approved in advance by the Manager.

*Development Fee.* The CDO will not be paid any development fees from the Company. Compensation for services provided in connection with the services rendered to the Company in connection with planning, supervising and completing construction of MyCareCoach will be paid in the form on Membership Units as defined above in Equity Interest.


**Conflicts of Interest**

The following inherent or potential conflicts should be considered by prospective investors before subscribing for Units:

**Tax Aspects**

Investors must look to their own tax advisors regarding the tax implications inherent in the Company and its operation, the income or deductions generated by the Company, and the impact the investment will have on their personal tax situations. No tax advice is given in this Memorandum.

**Summary of the Operating Agreement**

The following is a summary of some of the principal terms and provisions of the Operating Agreement. Certain topics are addressed elsewhere in this Memorandum, and this and other summaries are not intended to be exhaustive. They are qualified in their entirety by reference to the Operating Agreement, a copy of which is included in Part C of this Memorandum. Investors and their representatives should examine the Operating Agreement carefully.

**Term**

The Company was formed on 02/18/2015, and will continue in perpetuity unless terminated in accordance with the terms of the Operating Agreement.

**Members**

Bob Talbot is the Manager and the initial Member of the Company. An Offering of 250 Units will be sold to "accredited" investors as that term has been defined by the Securities and Exchange Commission in Regulation D. Purchasers of the Units will become Members in the Company. The Manager may also purchase Units.

Scott Anderson is the CDO and the initial Member of the Company. An Offering of 250 Units will be sold to "accredited" investors as that term has been defined by the Securities and Exchange Commission in Regulation D. Purchasers of the Units will become Members in the Company. The CDO may also purchase Units.

**Capital Contributions; No Assessments**

Each Member purchasing Units in the Offering must purchase at least 3 Units for a total of $12,000. Each Member shall contribute $4,000 per Unit to the Company, which shall be paid in cash or other immediate funds. See "Terms of the Offering." Additional Capital Contributions may be required as set forth in the Operating Agreement.

All funds or other property received by the Manager or the Company from an existing or prospective Member for the purchase of a Unit must be received in the name of the Company.

**Management**

The Manager is solely responsible for making virtually all decisions for the Company, including conducting its day-to-day operations. Membership Interests are able to vote only on selected issues permitted by the Operating Agreement. Members will not take part in the day-to-day management of the Company, and except where expressly provided otherwise in the Operating Agreement, no consent or approval of the Members is required for any action taken by the Manager or the Company. See "Voting Rights of Members" below. The Manager has broad and extensive powers to manage the Company. The Manager also has the duty, at the Company's expense, to cause to be maintained accurate books and records and to furnish quarterly investment reports, annual accounting reports and annual income tax information to the Members. The Manager intends to utilize methods of accounting and keep the Company books on a tax basis which will present financial information about the Company which the Manager believes is most accurate.

**Account Statements**

Each Member will be provided, not less frequently than annually, with an annual report containing financial statements for the Company prepared by an independent accountant.

**Transfers**

The transfer of Units is severely restricted by the Operating Agreement. No Member may transfer his Membership Interests without complying with the transfer terms set forth in the Operating Agreement. No assignee of a Member will have any rights with respect to the Company unless the assignee becomes a substituted Member of the Company by the affirmative vote of Members holding two-thirds (2/3) of all Percentage Interest.

**Liquidation and Final Distribution**

Upon dissolution of the Company, the Manager is required to wind up its affairs and to sell all assets of the Company. After paying all present liabilities of the Company, placing an amount determined as sufficient by the Manager into an escrow account to cover future or contingent liabilities of the Company, and after repaying any loans to the Company made by any Member, all remaining proceeds will be distributed to the Members in the order provided in Article 14 of the Operating Agreement.

**Other Businesses**

Under the Operating Agreement, any Member or Manager may, either directly or indirectly, own or invest in any other business of any type, even though the same may compete with the Company, and neither the Company nor any Member shall have any rights in or to such other property or business or the income therefrom.

**Maintaining Property**

The Manager will not commingle property of the Company with the property of any other entity or person.

**Limitation on Manager's Liability**

No Manager is liable to the Members for any act or failure to act within the scope of his authority if done on the advice of the Company's legal counsel or if done in good faith to promote the best interests of the Company, and is indemnified by the Company for any loss incurred in connection with such act or failure to act. However, to the extent that the indemnification provisions of the Operating Agreement purport to include indemnification for liabilities incurred under the Securities Act of 1933, as amended, in the opinion of the Securities and Exchange Commission such indemnification is contrary to public policy and therefore unenforceable.

**Liability of Members**

No Member is liable for Company debts or liabilities in excess of his Capital Contributions, except that any Member receiving a return of all or any part of his Capital Contributions may be liable, to the extent required by law, for the amount returned to the extent necessary to discharge liabilities to creditors who extended credit or whose claims arose before such return and before the Operating Agreement is amended to reflect such return.

**Voting Rights of Members**

Investors holding Membership Interests have the right to vote on various matters pertaining to the Company's operations. A few of those matters are specifically identified below along with the voting threshold requirement. For any matter not specifically provided for in the Operating Agreement the approval of two-thirds (2/3) of all Percentage Interests will constitute the act of the Members.

(a)   Election of a successor or additional Manager (Section 5.02 -- Approval of Eighty Percent (80.0%) of all Percentage Interests);

(b)   Removal of any Manager, with or without cause (Section 5.11 -- Approval of Eighty Five Percent (85.0%) of all Percentage Interest).

(c)   Approval of the sale, exchange or other disposition of all, or substantially, all of the property and assets of the Company (Section 6.04 -- Approval of One Hundred Percent (100.0%) of all Percentage Interests).

(d)   Approval of the sale, licensing, exchange or other disposition of the intellectual property of the Company (Section 6.05 -- Approval of One Hundred Percent (100.0%) of all Percentage Interests).

(e)   Approval of additional Capital Contributions (Section 8.02 -- Approval of two-thirds (2/3) of all Percentage Interests).

(f)   Approval as to the change in the allocation of Net Profits and Net Losses (Section 9.01 -- Approval of One Hundred Percent (100.0%) of all Percentage Interests).

(g)   Approval as to distributions (Section 9.03 -- Approval of two-thirds (2/3) of all Percentage Interests).

(h)   Approval of a new Agreed Value of the Company (Section 11.01 - Approval of One Hundred Percent (100.0%) of all Percentage Interests).

(i)   Approval of admitting any Person as a Member of the Company (Section 13.01 - Approval of two-thirds (2/3) of all Percentage Interests).

(j)   Approval of amendments to the Operating Agreement (Section 15.05 - Approval of Eighty Five Percent (85.0%) of all Percentage Interest)

**Description of the Units**

**General**

The Units offered represent Membership Interests in MyCareCoach, LLC, a Florida Limited liability company. Holders of Membership Interests have certain limited voting rights with respect to only those matters which are required to be submitted to a vote of the Members. Holders of Units also have rights to certain allocations and distributions. Such voting, allocation and distribution rights are based upon the number of Units outstanding. No Member has any preemptive rights. The ownership of Interests will not subject a Member to any personal liability for Company expenses, obligations or liabilities (except as set forth under "Summary of the Operating Agreement - Liability of Members"). Transferability of all Units will be severely restricted. See "Risk Factors" and "Summary of the Operating Agreement."

**Members' Return**

Members will be allocated all net profits and losses of the Company from operations in accordance with the Operating Agreement, or from liquidation of the business, less only fees paid to the Manager, including expenses.

**Distributions**

Distributions require the approval of two-thirds (2/3) of Percentage Interests. Subject to such approval, the Manager anticipates making Distributions from the Company in any year not less frequently than semi-annually. When the Company's cash funds and other property, after the payment of expenses and the making of all other expenditures, is in excess of the Company's working capital needs, then in those events the Manager will recommend to the Members that a distribution be made in accordance with the provisions of the Operating Agreement.

Any Distributions will be made to the Members and the Manager according to their respective allocation of Net Profits as identified in the Operating Agreement. On liquidation of the Company (i) all Members must contribute to the Company an amount equal to their respective negative Capital Account balances, but the obligation of a Member is limited to the amount of any unpaid Capital Contributions or as required by law, and (ii) all distributions will be made in accordance with the positive Capital Account balances of the Members.

Upon the dissolution of the Company, the Manager shall proceed promptly to wind up the business and affairs of the Company, and shall sell the assets of the Company in a commercially reasonable manner. When the winding up of the Company's business and affairs is completed, the Company shall pay all of the present liabilities of the Company other than liabilities to the Members, then transfer an amount determined by the Manager into an escrow account in the Company's name to cover future and/or contingent liabilities of the Company, and lastly repay in full both the principal and interest owed by the Company on any loans made by a Member to the Company. Any proceeds remaining thereafter shall, to the extent of the Members' positive Capital Account balances, be distributed to the Members in the ratio that each Members' Capital Account bears to the Capital Accounts of all other Members until all of such balances have been reduced to zero. Any proceeds remaining thereafter shall be distributed in the order of priority set forth below.

**Allocation of Net Income and Net Losses**

At the end of each fiscal year, Net Income, Net Losses, and tax credits of the Company shall be allocated among the Members as provided in Article 9 of the Operating Agreement.

All allocations of Net Income and Net Losses are subject to special allocations pursuant to Treasury Regulations promulgated under Code Section 704(b). See the Operating Agreement included as Part B of this Memorandum.

**Terms of the Offering**

The Company, through the Manager, is offering 250 Units on a "best efforts" basis. The Manager will not receive any commissions or other compensation relating to the sale of Units. The Company will not enter into Selling Agreements with licensed securities dealers. The minimum investment is $12,000 (3 Units). The Units are offered subject to the right of the Company to reject, in its sole discretion, any subscription for any reason.

The Offering will terminate on or before 03/31/2015, unless extended one or more times by the Company without notice to offerees to a date no later than 05/30/2015 (the "Termination Date"). If, at any time prior to the Termination Date, subscriptions have been received for less than the 30 required Units and accepted by the Company (which may include subscriptions from the Manager), then the Company may have an initial closing with respect to such accepted subscriptions and continue the Offering until the maximum offering of $1,000,000 is sold, or until the Termination Date, whichever first occurs. If, by the Termination Date, subscriptions for the required 30 Units have not been received and accepted by the Company, the Offering will be terminated and all subscription proceeds will be promptly returned to subscribers, without interest or deduction. Until the required Offering has been subscribed for and accepted by the Company, all subscription proceeds will be held in an escrow account established by the Company at a financial institution.

**How to Subscribe**

Any investor who wishes to purchase Units of Membership Interest should deliver the following documents to the Company:

1.   One dated and executed Subscription Agreement; and

2.   A check payable to the order of "MyCareCoach, LLC" in the amount subscribed.

**Limited Offering**

The Units offered by this Limited Offering Memorandum have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), nor under any state securities law, in reliance upon exemptions for transactions not involving a public offering.

Regulation D, adopted by the Securities and Exchange Commission under the Securities Act, is designed to provide a safe harbor exemption for limited offers and sales of securities. This limited offering is designed to comply with Rule 506 of Regulation D which, among other things, provides that:

(a)   The purchaser of Units must be an "accredited investor" as defined in Regulation D; and

(b)   The purchaser must be purchasing for his own account and not with a view to resale or distribution of the Units.

Written representations will be made to the Company concerning each of the above matters and certain other relevant information. Subject to the provisions of Regulation D, sales of Units will be made to an unlimited number of accredited investors. Certain additional suitability standards have been adopted by the Company which must be met by a prospective purchaser in order to purchase Units. See "Who May Invest."

**Who May Invest**

Purchase of the Units offered hereby is suitable only for persons who are "accredited investors" of adequate financial means who have no need for liquidity in this investment.

Accredited Investor Suitability Standards

The Company will conduct the offering in such a manner that the Units may be sold only to accredited investors, as that term is defined in Regulation D promulgated under the Securities Act of 1933.

A person is an "accredited investor" if that person falls within at least one of eight categories described in Regulation D. Accredited investors include, among others: (a) Qualified Trusts which are managed by a fiduciary which is a bank, insurance company, or registered investment adviser, or which have assets of more than $5,000,000; (b) banks, insurance companies and registered investment companies, (c) a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1,000,000; and (d) a natural person who had individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who reasonably expects to reach the same income level in the current year. Persons who are accredited investors are considered capable of fending for themselves and need not meet the same standards of sophistication as non-accredited investors. Accordingly, each prospective purchaser of the Units will be required to represent in his Membership Interest Subscription Agreement that he is an accredited investor. The Manager reserves the right to require a prospective investor to substantiate a claim that he is an accredited investor by supplying a balance sheet, prior year's federal income tax returns or other appropriate documentation.

In addition to being an "accredited investor" each prospective purchaser or his duly authorized representative must also represent in writing to the Company in a Subscription Agreement that: (a) the prospective purchaser has adequate means of providing for his current needs and personal contingencies and has no need for liquidity in this investment, and (b) the prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to his net worth and the investment in the Units will not cause such overall commitment to become excessive. Each person acquiring Unit(s) will be required to represent that he is purchasing them for his own account, for investment purposes, and not with a view to resale or distribution.

The representations of prospective purchasers referred to above will be reviewed to determine suitability, and the Manager will have the right to refuse a subscription for Units, if in its sole discretion, it

believes that the prospective purchaser does not meet the applicable suitability requirements, or the Units are otherwise an unsuitable investment for the prospective purchaser.

## Litigation

Neither the Company, the Manager nor any of its Affiliates is involved in any litigation material to the business of the Company.

## Legal Matters

The validity of the Membership Interests offered hereby will be passed for by the Company by the law firm of Carey, O'Malley, Whitaker & Mueller, and P.A. 712 South Oregon Ave Tampa, FL 33606-2516

## Additional Information

Each prospective investor may, at any time prior to purchasing a Unit, have access to all relevant material information with respect to the Company and its proposed activities, to the extent that the Manager possesses such information or can acquire it without unreasonable effort or expense.

Prospective investors or their representatives may also, at any time during ordinary business hours prior to purchasing Units, ask questions of the Manager with respect to the terms and conditions of the Offering and the information contained in this Memorandum and request additional information necessary to verify such information. The Manager will provide answers to such questions and provide such information to the extent such answers and information are possessed by the Manager or can be obtained by the Manager without unreasonable effort or expense.

The relevant books, records, documents and information with respect to the Company and to the offering of Units are and will be retained in the office of the Company. Each prospective investor is invited to inspect and copy, or request copies of, any such materials at the Company's offices during ordinary business hours. These materials, documents or agreements include additional financial information on the Manager and its Members, additional information regarding the Company and its affiliates and all documents or agreements relating to the activities of the Company which are not included as exhibits hereto. All references herein to contracts or other agreements are qualified in their entirety by reference to each contract or agreement.

## No Financial Statements

Because the Company is newly formed, and has no established history of operation, historical financial statements of the Company are not available.

**PART B – BUSINESS PLAN**

See attached MyCareCoach, LLC Business Plan dated February, 2015

- Plan for Licensing
- Plan for Turn Key Operation

PART C – OPERATING AGREEMENT

**Operating Agreement**
**MyCareCoach, LLC**
**A Florida Limited Liability Company**
**Effective as of February 19th, 2015**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| CONFIDENTIALITY AGREEMENT | | 2 |
| | | 2 |
| RISK FACTORS; LEGENDS | | 2 |
| TABLE OF CONTENTS | | 3 |
| PART A -- SUMMARY | | 7 |
| PART B -- BUSINESS PLAN | | 23 |
| PART C -- OPERATING AGREEMENT | | 24 |
| ARTICLE 1. DEFINITIONS | | 29 |
| ARTICLE 2. FORMATION OF COMPANY | | 30 |
| 2.01 | Formation | 30 |
| 2.02 | Name | 30 |
| 2.03 | Principal Place of Business | 30 |
| 2.04 | Registered Office and Registered Agent | 30 |
| 2.05 | Duration | 31 |
| ARTICLE 3. NATURE OF BUSINESS | | 31 |
| 3.01 | Purpose | 31 |
| ARTICLE 4. MEMBERS | | 31 |
| 4.01 | Members | 31 |
| 4.02 | Dissociation | 31 |
| ARTICLE 5. MANAGEMENT – MANAGER'S RIGHTS AND DUTIES | | 31 |
| 5.01 | Management | 31 |
| 5.02 | Number, Tenure, Qualifications and Election | 31 |
| 5.03 | Specific Powers | 31 |
| 5.04 | Members Have No Authority to Bind | 32 |
| 5.05 | Liability | 32 |
| 5.06 | Nonexclusive Relationship | 32 |
| 5.07 | Related Party Transactions | 33 |
| 5.08 | Bank Accounts | 33 |
| 5.09 | Indemnification | 33 |
| 5.10 | Resignation | 33 |
| 5.11 | Removal | 33 |
| 5.12 | Vacancy | 33 |
| 5.13 | Compensation | 33 |
| 5.14 | Confidentiality | 33 |
| ARTICLE 6. RIGHTS AND OBLIGATIONS OF MEMBERS | | 33 |
| 6.01 | Limitation of Liability | 33 |
| 6.02 | Company Debt | 33 |

| | | |
|---|---|---|
| 6.03 | List of Members | 33 |
| 6.04 | Sale of Assets | 34~~33~~ |
| 6.05 | Sale or Licensing of Intellectual Property | 34 |
| 6.06 | Access to Records | 34 |
| 6.07 | Priorities Among Members | 34 |
| 6.08 | Liability of a Member of the Company | 34 |
| 6.09 | No Participation in Management | 34 |
| ARTICLE 7. | MEETINGS OF MEMBERS | 34 |
| 7.01 | Meetings | 34 |
| 7.02 | Place of Meetings | 34 |
| 7.03 | Notice of Meetings | 34 |
| 7.04 | Meeting Without Notice | 34 |
| 7.05 | Record Date | 34 |
| 7.06 | Quorum | 34 |
| 7.07 | Manner of Acting | 35 |
| 7.08 | Proxies | 35 |
| 7.09 | Action by Members Without a Meeting | 35 |
| 7.10 | Waiver of Notice | 35 |
| 7.11 | Voting | 35 |
| 7.12 | Appearance at Member Meetings | 35 |
| ARTICLE 8. | CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS | 35 |
| 8.01 | Member's Initial Capital Contribution | 35 |
| 8.02 | Additional Capital Contributions | 35 |
| 8.03 | Capital Accounts | 37~~36~~ |
| 8.04 | Withdrawal or Reduction of Member's Contributions to Capital. | 37 |
| ARTICLE 9. | FINANCIAL PROVISIONS | 37 |
| 9.01 | Allocations of Profits and Losses | 37 |
| 9.02 | Special Allocations to Capital Accounts. | 38 |
| 9.03 | Distributions | 40 |
| 9.04 | Limitations Upon Distributions | 40 |
| 9.05 | Accounting | 40 |
| 9.06 | Interest on and Return of Capital Contributions | 40 |
| 9.07 | Loans to Company | 40 |
| 9.08 | Accounting Period | 40 |
| 9.09 | Maintenance of Records | 40 |
| 9.10 | Tax Returns | 41~~40~~ |
| 9.11 | Tax Information | 41~~40~~ |
| 9.12 | Tax Matters Partner | 41 |

ARTICLE 10.   DEADLOCK                                                        41

   10.01   Deadlock.                                            41

   10.02   Mediation.                                           41

   10.03   Binding Arbitration.                                 41

ARTICLE 11.   VALUATION                                                       41

   11.01   Agreed Value.                                        41

ARTICLE 12.   TRANSFERABILITY                                                 42

   12.01   Limitation on Transferability                        42

   12.02   Transfer Notice                                      42

   12.03   Company Right of First Refusal.                      42

   12.04   Member Right of First Refusal                        43~~42~~

   12.05   Involuntary Transfer                                 43

   12.06   Lifetime Gifts                                       43

   12.07   Prohibited Transfers                                 43

   12.08   Status of Transferee.                                44~~43~~

   12.09   Costs                                                44~~43~~

ARTICLE 13.   ADDITIONAL MEMBERS                                              44

   13.01   Additional Members                                   44

ARTICLE 14.   DISSOLUTION                                                     44

   14.01   Events of Dissolution                                44

   14.02   Liquidation and Distribution.                        44

   14.03   Articles of Dissolution.                             45~~44~~

   14.04   Filing of Articles of Dissolution.                   45~~44~~

   14.05   Return of Capital Contribution and Nonrecourse to Other Members   45

ARTICLE 15.   MISCELLANEOUS PROVISIONS                                        45

   15.01   Notices                                              45

   15.02   Books of Account                                     45

   15.03   Applicable Law and Venue                             45

   15.04   Waiver of Action for Partition                       46~~45~~

   15.05   Amendments                                           46~~45~~

   15.06   Additional Documents                                 46~~45~~

   15.07   Construction                                         46~~45~~

   15.08   Headings                                             46~~45~~

   15.09   Default Waivers                                      46~~45~~

   15.10   Rights and Remedies Cumulative                       46

   15.11   Severability                                         46

   15.12   Successors and Assigns                               46

   15.13   Creditors                                            46

15.14    Counterparts                                      46
15.15    Integration                                       46
15.16    Interpretation                                    46
15.17    Incorporation of Exhibits                         46
Exhibit A: Members                                        49~~48~~
Exhibit B: Election of Manager                            50~~49~~
Exhibit C:  Agreed Value                                  52~~51~~
     PART D -- SUBSCRIPTION DOCUMENTS                      53~~52~~

## Operating Agreement

This Operating Agreement is entered into and shall be effective as of February 18th, 2015, by and among the Persons who are identified as Members on Exhibit A attached hereto and who have executed a counterpart of this Agreement as Members pursuant to the provisions of the Act, on the following terms and conditions:

# ARTICLE 1.  DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

(a)     "Act" shall mean the Florida Limited Liability Act, *805 ILCS § 180/1-1 et seq.,* as amended from time to time (or any corresponding provisions of succeeding law).

(b)     "Articles of Organization" shall mean the Articles of Organization of MyCareCoach, LLC, as filed with the Florida Secretary of State and as amended from time to time.

(c)     "Capital Account" shall mean the total Capital Contribution to the Company by a Member as adjusted under this Operating Agreement, the Code or the Treasury Regulations up to any given date pursuant to Article 8.

(d)     "Capital Contribution" shall mean the cash, property or assets contributed, the services rendered to the Company by a Member or a promissory note or other obligation to contribute cash, property or assets, or to perform services.

(e)     "Code" shall mean the "Internal Revenue Code of 1986" or any comparable superseding revenue statute of the United States of America.

(f)     "Company" shall mean MyCareCoach, LLC.

(g)     "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)     credit to such Capital Account any amount which a Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(ii)    debit to such Capital Account the items described in Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(h)     "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the normal operation of the Company's business; and (iii) such Reserves as the Manager deems reasonably necessary for the proper operation of the Company's business.

(i)     "Economic Interest" shall mean the share of a Member or Economic Interest Owner in and to the Net Profits, Net Losses and other distributions of the property and assets of the Company pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Managers. An "Economic Interest" is not a Membership Interest.

(j)     "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a substituted Member under this Operating Agreement, or the Act, and who is not a Member of the Company.

(k)     "Entity" shall mean any general partnership, limited partnership, Limited Liability Company, corporation, joint venture, trust, estate, association, governmental body or other judicial being.

(l)     "Initial Capital Contribution" means the initial capital contribution by a Member to the Company pursuant to this Operating Agreement.

(m)    "Interest Holder" shall mean either a Member or an Economic Interest Owner.

(n)     "Manager" or "Managers" shall mean one or more Persons designated by the Members to manage the Company pursuant to this Operating Agreement and the Act.

(o)     "Member" shall mean each Person owning a Membership Interest in the Company, with the rights and obligations specified in this Operating Agreement and the Act.

(p)     "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act, except to the extent expressly limited by the provisions of this Operating Agreement.

(q)     "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the cash method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

(r)     "Operating Agreement" shall mean this Amended Operating Agreement of the Company, including all exhibits and/or schedules attached hereto, as amended by the Members from time to time.

(s)     "Percentage Interest" shall mean an Interest Holder's Membership Interest or Economic Interest respectively owned by each Interest Holder in relation to the total Membership Interest and Economic Interest collectively owned by all of the other Interest Holders in the Company, as depicted on the attached Exhibit A.

(t)     "Person" shall mean any individual or Entity.

(u)     "Representative" shall mean the legal representative or successor-in-interest of a Member.

(v)     "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, or other costs or expenses incident to the ownership or operation of the Company's business.

(w)    "Securities Act" shall mean the Securities Act of 1933, as amended.

(x)     "Tax Matters Partner" shall be given the meaning as provided in Article 9.12.

(y)     "Treasury Regulations" shall mean and include proposed, temporary and final regulations promulgated pursuant to or under the authority of the Code.

## ARTICLE 2.  FORMATION OF COMPANY

2.01    **Formation.**  The Company has been organized as a Florida Limited Liability Company by executing and delivering Articles of Organization to the Florida Secretary of State in accordance with and pursuant to the Act.

2.02    **Name.**  The name of the Company is MyCareCoach, LLC.

2.03    **Principal Place of Business.**  The principal place of business of the Company within the State of Florida will be located at 8374 Market Street, Suite 472 Lakewood Ranch, FL 34202. The Company may establish other places of business, located within or outside the State of Florida, as the Manager may deem necessary or desirable to conduct the business of the Company.

2.04    **Registered Office and Registered Agent.**  The Company's registered office shall be at the office of its registered agent at 712 South Oregon Ave Tampa, FL 33606-2516, and the name of its registered agent shall be Carey, O'Malley, Whitaker & Mueller, and P.A. . The registered office

and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Florida Secretary of State pursuant to the Act.

**2.05**   **Duration**.  The Company will remain in existence until the Company is dissolved pursuant to and in compliance with the provisions of this Operating Agreement, or the Act.

## ARTICLE 3.  NATURE OF BUSINESS

**3.01**   **Purpose**.  The purpose of the Company shall be the transaction of any or all lawful business for which limited liability companies may be organized under the Act.

## ARTICLE 4.  MEMBERS

**4.01**   **Members**.  There will be, so long as the Company remains in existence, at least one (1) Member. The names, business addresses and social security numbers, or, if applicable, the federal employer identification number, of the Persons who are the Members of the Company on the Execution Date of this Operating Agreement, and the Membership Interests and the Economic Interests, if any, which are respectively owned by each of the Members on the Execution Date, are depicted on Exhibit A. If, and whenever, the Members of the Company change, or if any of the other information which is described and disclosed on Exhibit A changes, then, in such event, a revised Exhibit A will be substituted and attached to this Operating Agreement in replacement of the existing Exhibit A.

**4.02**   **Dissociation**.  In the event a Member dissociates, then in that event, the Member's right to participate in the management and conduct of the Company's business terminates, and the Member ceases to be a Member and is treated the same as an Economic Interest Holder.

## ARTICLE 5.  MANAGEMENT – MANAGER'S RIGHTS AND DUTIES

**5.01**   **Management**.  The business and affairs of the Company shall be managed exclusively by its Manager. The Manager shall direct, manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

**5.02**   **Number, Tenure, Qualifications and Election**.

   (a)  The Company shall have one (1) Manager. The number of Managers of the Company may only be changed by the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest.

   (b)  The Manager shall be elected by the affirmative vote of Members holding eighty percent (80.0%) of all Percentage Interest, which election shall be set forth in Exhibit B.

   (c)  Upon election, a Person shall serve as Manager until a further election is held by the Members at a Member meeting pursuant to Article 7.01.

   (d)  A Manager need not be a Member of the Company.

**5.03**   **Specific Powers**.  Without limiting the generality of Article 5.01, the Manager is specifically authorized and empowered, on behalf of the Company:

   (e)  To acquire property and assets from any Person as the Manager may determine is appropriate, irrespective of the affiliation of such Person with any Manager or Member.

   (f)  To borrow funds from banks, other lending institutions, the Manager, the Members or any Economic Interest Owners, or affiliates of the Manager, Members or Economic Interest Owners, on such terms and conditions as the Manager may deem appropriate, and, in connection with such loans, to pledge, encumber and grant security interests in the property and assets of the Company to secure repayment of the borrowed funds.  No debt may be contracted and no liability may be incurred by or on behalf of the Company except by the Manager, or, to the extent permitted under the Act, by agents or employees of the Company who are expressly authorized by the Manager to contract such debt or to incur such liability.

(g) To purchase general liability, professional liability, where applicable, fire and casualty and other appropriate insurance to protect the property and assets owned by the Company and the business being operated by the Company.

(h) To acquire by purchase, lease or otherwise any real or personal property in the name of the Company that may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company.

(i) To hold title to and to own real estate and personal property in the name of the Company.

(j) To invest Company funds.

(k) With the affirmative vote of Members holding one-hundred percent (100.0%) of all Percentage Interest, to sell, exchange or otherwise dispose of all, or substantially all, of the property and assets of the Company as part of a single transaction or plan.

(l) To execute, on behalf of the Company, all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents relating to the acquisition, mortgage or disposition of property and assets owned by the Company, assignments, bills of sale, leases and any other instruments or documents necessary to the operation of the business of the Company.

(m) To employ accountants, legal counsel, agents (including affiliates of Members) or other experts to perform services for the Company.

(n) To enter into contracts and other agreements related to the operation and business of the Company.

(o) To take, or refrain from taking, all actions, not expressly proscribed or limited by this Operating Agreement, as may be necessary or appropriate to the operation and business of the Company.

5.04   **Members Have No Authority to Bind**.  Unless authorized to do so by this Operating Agreement, or by the Manager of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.05   **Liability**.  The Manager shall perform the Manager's duties in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager. Without limiting the generality of the prior sentence, except as otherwise required by law or the provisions of this Agreement, no Manager and no officer, director, member or manager of any Manager, shall be personally liable to any Member or to the Company for (a) any action taken or failure to act as Manager with respect to the Company unless such action taken or failure to act is a violation of the material provisions of this Operating Agreement or is fraudulent, in bad faith, grossly negligent or malfeasant, and then only to the extent of the Manager's or such other person's own bad faith, gross negligence or malfeasance, (b) any action or inaction arising from reliance in good faith upon the opinion or advice as to legal matters of legal counselor as to accounting matters of accountants selected by any of them with reasonable care, or (c) any action or inaction of any agent, contractor or consultant selected and monitored by any of them with reasonable care.

5.06   **Nonexclusive Relationship**.  The Manager will not be required to manage the Company as his or her sole and exclusive function, and the Manager may be involved with other business interests and may engage in activities related or unrelated to the business of the Company without being deemed to be in violation of this Operating Agreement or being deemed to have

breached its fiduciary duty to the Company, its Members or any other Economic Interest Owner. Neither the Company nor any Member or Economic Interest Owner possesses any right, by virtue of this Operating Agreement, to share or participate in other investments or activities of the Manager, which are related or unrelated to the business of the Company or to the income or proceeds derived from such investments or activities.

5.07 **Related Party Transactions**.  Agreements and arrangements between the Company and the Manager, Members or Economic Interest Owners, or affiliates thereof, shall not be subject to challenge by any Member or Economic Interest Holder on the basis of a conflict of interest or the relatedness of the parties.

5.08 **Bank Accounts**.  The Manager may maintain bank accounts in the name of the Company and may act as the signatory in respect to such bank accounts; unless the Members determine otherwise upon the affirmative vote of Members holding fifty-one percent (51.0%) of all Percentage Interest.

5.09 **Indemnification**.  The Company shall, to the maximum extent permitted by law, indemnify the Manager and such other employees and agents of the Company.

5.10 **Resignation**.  A Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11 **Removal**.  A Manager may be removed at any time, with or without cause, by the affirmative vote of Members holding eighty-five percent (85.0%) of all Percentage Interest at a meeting called expressly for that purpose pursuant to Article 7. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.12 **Vacancy**.  In the event there is no actively serving Manager of the Company due to resignation (Article 5.10), removal (Article 5.11) or death (in the case a Manager is an individual), a new Manager shall be elected pursuant to Article 5.02.

5.13 **Compensation**.  The compensation for the Manager will be determined by the affirmative vote of Members holding fifty-one percent (51.0%) of all Percentage Interest at a meeting called expressly for that purpose pursuant to Article 7.

5.14 **Confidentiality**.  Except as contemplated hereby or required by a court of competent authority, the Managers and Members shall keep confidential and shall not disclose to third parties the Company's Confidential Information. For purposes of this Operating Agreement the term "Confidential Information" shall mean: any matter, item, or material which is not generally known by or available to the public or the industry and in which the Company has a legitimate proprietary interest. Confidential Information includes but is not limited to the following: vendor lists, compensation data, business practices, management philosophies, marketing plans and strategies, business plans, market studies, financial reports, business projections, and methods of operation.

## ARTICLE 6.  RIGHTS AND OBLIGATIONS OF MEMBERS

6.01 **Limitation of Liability**.  Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

6.02 **Company Debt**.  No Member will be personally liable in respect to any of the debts, obligations or losses of the Company in excess of that Member's respective Capital Contributions and any additional responsibility of that Member, as created by this Operating Agreement, to contribute to the capital of the Company.

6.03 **List of Members**. At the request of a Member, the Manager will furnish that Member with a list which depicts the names and current business addresses of the Members and the Membership Interests, Percentage Interests and Economic Interests, if any, which are respectively owned by the Members.

**6.04** **Sale of Assets**.  The Members, upon the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest, may approve the sale, exchange or other disposition of all, or substantially all, of the property and assets of the Company as part of a single transaction or plan.

**6.05** **Sale or Licensing of Intellectual Property**.  The Members, upon the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest, may approve the sale, licensing, exchange or other disposition of the intellectual property of the Company.

**6.06** **Access to Records**.  Each Member, during ordinary business hours, as reasonably determined by the Manager, may inspect and copy, at such Member's sole cost and expense, the records which this Operating Agreement or the Act specifies the Company is to maintain, and such other documents as the Managers, in their discretion, may deem appropriate.

**6.07** **Priorities among Members**.  Except to the extent otherwise expressly stated in this Operating Agreement, no Member will be entitled to any priority in respect to any other Member or any Economic Interest Owner, either as to the return of Capital Contribution or as to Net Profits or Net Losses.

**6.08** **Liability of a Member of the Company**. A member who receives a distribution or the return, in whole or in part, of the Member's Capital Contribution is liable to the Company only to the extent provided by the Act.

**6.09** **No Participation in Management**.  Except for voting on approvals as explicitly provided in this Operating Agreement, no Member shall participate in the control, management, direction or operation of the affairs of the Company.

## ARTICLE 7.  MEETINGS OF MEMBERS

**7.01** **Meetings**.  Meetings of the Members, for any purpose or purposes, may be called by the Manager or by any Member. If all of the Members shall meet at any time and place, either within or outside of the State of Florida, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

**7.02** **Place of Meetings**.  The Manager or Member calling the meeting may designate any place, within the State of Florida, as the place of meeting for any meeting of the Members. If no designation is made, the place of the meeting shall be the principal place of business of the Company.

**7.03** **Notice of Meetings**.  Except as otherwise provided in this Operating Agreement, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than one (1) nor more than seven (7) days before the date of the meeting, either personally, by mail or by email, by or at the direction of the Manager or the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail addressed to the Member at that Person's address as it appears on the books of the Company.

**7.04** **Meeting Without Notice**.  If all of the Members meet and specifically consent to the holding of a meeting, that meeting will be valid without a call or other notice, and lawful action may be conducted and adopted by the Members at such meeting.

**7.05** **Record Date**.  In order to determine the Members entitled to notice of or to vote at a meeting of the Members, or at any adjournment of that meeting, or the Members entitled to receive payment of any distribution, or in respect to any other purpose under this Operating Agreement or the Act, the date the notice of the meeting is mailed or emailed; or, if applicable, the date the Members adopt an appropriate resolution will be the record date to be utilized in determining the Persons who then constitute the Members of the Company.

**7.06** **Quorum**.  Members holding sixty-seven percent (67.0%) of all Percentage Interest, represented in person or by proxy, will constitute a quorum at any meeting of the Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting without further notice. If the meeting is postponed more than sixty (60) days,

or if after the adjournment a new record date is established in respect to the adjourned meeting, a notice of the adjourned meeting will be delivered to each Member of record entitled to vote at the meeting. At such adjourned meeting where a quorum is present or represented, any lawful business may be transacted by the Members. The Members present at a properly organized meeting, where a quorum has been established, may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of the Members owning that number of Membership Interests whose absence would cause less than a quorum under this Operating Agreement.

**7.07**   **Manner of Acting**.   If a quorum is present, the affirmative vote of the Members holding sixty-seven percent (67.0%) of all Percentage Interest will constitute the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization or by this Operating Agreement. Only Persons owning a Membership Interest may vote on or consent to action, and only their vote or consent will be counted in determining whether the approval of the Members was properly obtained.

**7.08**   **Proxies**.   At all meetings of the Members, a Member may vote in person or by a proxy executed, in writing, by the Member or by an authorized attorney-in-fact of that Member.  Proxies must be filed with the Manager prior to the commencement of the meeting, and no proxy will be valid after eleven (11) months from the date that proxy is executed, unless a contrary expiration date is specifically stated in the proxy.

**7.09**   **Action by Members Without a Meeting**.   Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the requisite number of Members representing the requisite Percentage Interest in the Company that is required to authorize said action described and delivered to the Manager of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Article is effective when the requisite number of Members representing the requisite Percentage Interest in the Company is required to authorize said action described have signed the consent, unless the consent specifies a different effective date.

**7.10**   **Waiver of Notice**.   When any notice is required to be delivered to any Member by the provisions of this Operating Agreement or the Act, a waiver of that notice, expressed in writing and signed by the Person entitled to such notice, whether signed prior or subsequent to the date and hour stated in the notice, will be the equivalent delivery of that notice.

**7.11**   **Voting**.   When the Members are entitled to vote under this Operating Agreement, each Member will vote the Membership Interest which that Member then owns.

**7.12**   **Appearance at Member Meetings**.   A Member may participate in a meeting of Members by means of telephone, Internet or similar communication technology enabling all Members participating in the meeting to reasonably communicate with one another. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

## ARTICLE 8.  CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

**8.01**   **Member's Initial Capital Contribution**.   Each Member's Initial Capital Contribution shall be noted on the Company's books and records.

**8.02**   **Additional Capital Contributions**.    If the Manager determines that additional funds are reasonably necessary to meet the expenses and obligations of the Company; or are required by the Company in furtherance of its business purpose, then upon the affirmative vote of Members holding two-thirds (2/3) of all Percentage Interest, the Manager may obtain such funds, by requiring Members to contribute additional capital to the Company ("Capital Call").

   (a) If the Manager makes a Capital Call, the Manager shall provide notice to the Members, which notice shall set forth: (i) the total amount of additional capital required; (ii) the pro rata amount of capital required from each Member, based upon each Member's Percentage Interest (as of the date of the notice); (iii) the purpose for which the capital is being raised; and (iv) such other information as the Manager deems relevant.

(b) By executing this Operating Agreement, each Member covenants and agrees to contribute his, her, or it's pro rata share of any Capital Call which is made by the Manager. Each Member shall deliver to the Company his, her, or its pro rata share of any Capital Call no later than thirty (30) days following the date of the notice described in Article 8.02(a).

(c) If one or more Members does not contribute all of his, her, or its pro rata share of the capital sought in a Capital Call (each, a "Non-Contributing Member"), a Member or Members who has contributed their pro rata share (the "Contributing Members") may also contribute the share of any Non-Contributing Member on the following terms. The Managers shall give notice that a Member failed to make a Capital Contribution required by the Capital Call to all Contributing Members. Each of the Contributing Members shall have the option to contribute that proportion of the Non-Contributing Member's Capital Call which equals the proportion of Percentage Interest owned by such Contributing Member, within seven (7) days after receipt of the notice from the Manager. If a Contributing Member fails to exercise his right to contribute within said seven (7) day period, then each remaining Contributing Members shall have a right to contribute the share that the Contributing Member elects not to contribute. In the case of a single remaining Contributing Member, that Person's option shall be to contribute the full contribution of a Non-Contributing Member. In the case of two or more remaining Contributing Members, each such remaining Contributing Member shall have the option to contribute the portion of the Non-Contributing Member's contribution that bears the same proportion to the total contribution for the Non-Contributing Members. Notwithstanding the foregoing, all Contributing Members may, by unanimous agreement among themselves, determine the proportions in which some or all of them may contribute the Non-Contributing Members' contribution. Contributing Members who contribute on behalf of Non-Contributing Members pursuant to this Article 8.02(c) shall be entitled to an adjustment of their Percentage Interest pursuant to Article 8.02(d)(i). In the event no Contributing Members make the contribution of the Non-Contributing Member, then the Manager shall have the discretion to exercise the rights under Article 8.02(d).

(d) Any Non-Contributing Member shall be subject, in the discretion of the Manager, to any of the remedies set forth in this Article 8.02(d)

   i.   *Dilution.* The Manager may, in his or her discretion and with no further consent or action required by or of any Non-Contributing Member, amend this Operating Agreement by revising Exhibit A to adjust the Percentage Interests of all Members as follows: for each Member, the revised Percentage Interest shall equal a fraction, the numerator of which is the sum of (a) the dollar amount of all capital contributed by such Member prior to the current Capital Call plus (b) two times the amount, if any, of capital contributed by such Member in the current Capital Call, and the denominator of which is the sum of (x) the total dollar amount of all capital contributed by all Members prior to the current Capital Call plus (y) two times the amount of capital contributed by all Members in the current capital Call. This Article 8.02(d)(i) shall have no effect on the calculation of any Member's Capital Account as provided for in Article 8.03 of this Operating Agreement and shall have no impact on his liability for obligations of the Company.

   ii.  *Suit for Specific Performance.* The Manager may, in their discretion commence suit in the name of the Company in the Circuit Court of McLean County, State of Florida, against a Non-Contributing Member, to compel the Member to fund their portion of the approved Capital Call. In any such action, in addition to any other remedies, the Company, if it prevails, shall be entitled to an award of its reasonable attorney fees and costs.

   iii. *Redemption.* The Company shall have the right to redeem all of the Non-Contributing Member's Membership Interest in the Company for then current Agreed Value of the Membership Interest as established in Article 11, less the pro rata amount of the capital sought in the Capital Call not paid by the Non-Contributing Member.  Upon such redemption, the Non-Contributing Member's Membership Interest shall be redistributed pro rata to the remaining Members; and the Non-Contributing Member shall remain liable for all of his, her or its obligations to the Company.

(e) None of the terms, covenants, obligations or rights contained in this Article 8.02 is or shall be deemed to be for the benefit of any person or entity other than the Members and the Company, and no such third person shall under any circumstances have any right to compel any actions or payments by the Managers and/or the Members.

8.03   **Capital Accounts**.

(a)  Separate Capital Accounts will be maintained on behalf of the Members, and any Economic Interest Owners, in compliance with the requirements prescribed in the Code and the Treasury Regulations. The Capital Accounts will be respectively increased by: (i) the amount of cash contributed by the Members to the Company; (ii) the fair market value of property and assets contributed by the Members to the Company, after subtracting the liabilities secured by that contributed property or assets which the Company assumes; (iii) allocations to the Members, or any Economic Interest Owners, of Net Profits and Net Losses; and (iv) other allocations of income to the Members or Economic Interest Owners. The Capital Accounts will be respectively decreased by: (i) the amount of cash distributed to the Members, or any Economic Interest Owners, by the Company; (ii) the fair market value of property and assets distributed to the Members or Economic Interest Owners by the Company, after subtracting the liabilities secured by that distributed property or assets which the Members or Economic Interest Owners assume; (iii) allocations to the Members or Economic Interest Owners of appropriate expenditures; and (iv) allocations to the accounts of the Members or Economic Interest Owners of Company losses and deductions, after adjustments to reflect book value.

(b)  In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c)  The manner in which Capital Accounts are to be maintained pursuant to this Article 8.03 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Article 8.03 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Article 8.03, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in the Operating Agreement.

(d)  Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within seventy (70) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by an Interest Holder whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(e)  Except as otherwise required in the Act (and subject to Articles 8.01 and 8.02), no Interest Holder shall have any liability to restore all or any portion of a deficit balance in such Interest holder's Capital Account.

8.04   **Withdrawal or Reduction of Member's Contributions to Capital.**

(a)  A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)  A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

## ARTICLE 9.  FINANCIAL PROVISIONS

9.01   **Allocations of Profits and Losses**. Upon the commencement of operations, the Net Profits and Net Losses of the Company for each fiscal year will be allocated as follows:

| NAME | NET PROFITS | NET LOSSES |
|------|-------------|------------|
| Bob Talbot, Northern Tier Medical | 19.17% | 9% |

| | | |
|---|---|---|
| Innova HealthCare Services, Inc. | 27.5% | 13% |
| Munear Kouzbari | 3.33% | 1.5% |
| COO TBD | 1.67% | 1% |
| Medical Web Experts, LLC | 6.67% | 3.5% |
| Investor | 41.67% | 72% |

The allocation of Net Profits and Net Losses shall only be changed upon the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest. If due to a Transfer, a Capital Call or otherwise, a Member's Percentage Interest is changed at any time, the Member's Net Profits and Net Losses shall be allocated, at the Manager's option, based either on closing the Company books (as though the Company's tax year has ended) or on a pro rata basis, in the ratio of the number of days in the fiscal year of the Company before and after the effective date of the change in Percentage Interest.

**\* As set forth more fully in the Company's February 18, 2015, Consent Resolution, all profits/losses attributable to the "*TBD – Investor(s)*" shall be held by the Company for the benefit of the "*TBD – Investor(s)*" until such time as said investor(s) are identified and made parties to the Operating Agreement.**

9.02    **Special Allocations to Capital Accounts.**  Notwithstanding Article 9.01:

   (a) No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in Company profits pursuant to Article 9.01.

   (b) In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Article 9.02(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

   (c) In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d) Notwithstanding any other provision of this Article 9.02, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Article 9.02(d) is intended to comply with the minimum gain charge back requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, and the minimum gain charge back requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Manager may in its discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain charge back requirement in accordance with Treasury Regulation Section 1.704-2(f)(4).

(e) Items of Company loss, deduction and expenditures described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g) In accordance with Code Section 704(c)(1)(A) and Section 1.704-1 (b)(2)(i)(iv) of the Treasury Regulations, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of consideration.

(h) Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the contribution.

(i) In the case of any distribution by the Company to an Interest Holder, such Interest Holder shall be treated as recognizing gain in an amount equal to the lesser of:

  i. The excess (if any) of (a) the fair market value of the property (other than money) received in the distribution over (b) the adjusted basis of such Member's Membership Interest or, Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

  ii. The Net Precontribution Gain (as defined in Code Section 737(b)) of the Interest Holder. The Net Precontribution Gain means the net gain (if any) which would have been recognized by the distributee Interest Holder under Code Section 704(c) (1) (B) of all property which (a) had been contributed to the Company within five years of the distribution, and (b) is held by the Company immediately before the distribution, if such property had been distributed by the Company to another Interest Holder. If any portion of the property distributed consists of property which had been contributed by the distributee Interest Holder to the Company, then such property shall not be taken into account under this Article 9.02 and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

(j)  In connection with a Capital Contribution of money or other property (other than a *de minimis* amount) by a new or existing Interest Holder as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a *de minimis* amount) by the Company to a retiring Interest Holder (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1 (b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is property reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(k)  All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated, any gain from the sale or other disposition of such property.

(l)  Any credit or charge to the Capital Accounts of the Members pursuant to Articles 9.02(b), (c), and/or (d), hereof shall be taken into account in computing subsequent allocations of Net Profits and Net Losses pursuant to Article 9.01, so that the net amount of any items charged or credited to Capital Accounts pursuant to Articles 9.01 and 9.02 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article 9 if the special allocations required by Articles 9.02(b), (c), and/or (d) had not occurred.

**9.03**  **Distributions**.  Except as otherwise provided for in this Agreement, an Interest Holder has no right to demand and receive any distribution in a form other than cash. All distributions of cash or other property shall be made to an Interest Holder pro rata in proportion to the respective Percentage Interests of the Interest Holders on the record date of such distribution. Except as provided in Article 9.04, all distributions of distributable cash and property shall be made at such time as approved by the affirmative vote of Members holding two-thirds (2/3) of all Percentage Interest. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Article 9.03.

**9.04**  **Limitations Upon Distributions**.  As prescribed in the Act, if there are creditors of the Company, no distributions or return of contributions will occur, notwithstanding the preceding provisions of this Article, if, after effectuating that distribution or return of contribution, the Company would be insolvent or the net assets of the Company would be less than zero.

**9.05**  **Accounting**.  The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the cash method of accounting.

**9.06**  **Interest on and Return of Capital Contributions**.  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

**9.07**  **Loans to Company**.  Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

**9.08**  **Accounting Period**.  The accounting period of the Company will be the calendar year, which is referred to in this Operating Agreement as the fiscal year.

**9.09**  **Maintenance of Records**.  At the expense of the Company, the Manager will maintain, at the principal place of business of the Company, the records prescribed by the Act.  The records maintained by the Company may be inspected and copied by any Interest Holder, after that Interest Holder delivers a request, in writing, to the Manager and then allows the Manager a reasonable opportunity to respond to such request.

**9.10**    **Tax Returns**. The Tax Matters Partner will direct the preparation and timely filing of all tax returns which the Company is required to file under the Code, reflecting the taxation of the Company as a partnership, and all other returns required by the jurisdictions where the Company is transacting business. Copies of such returns will be furnished to the Interest Holders by the Tax Matters Partner. All elections which are available to the Company under the Code, the Treasury Regulations or other applicable laws will be exercised by the Tax Matters Partner, in the Tax Matter Partner's sole discretion; however, the Tax Matters Partner will exercise a particular election if approved by the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest.

**9.11**    **Tax Information**.  Within thirty (30) days after the end of each fiscal year, the Tax Matters Partner will cause to be delivered to each Interest Holder at any time during such fiscal year, a Form K-1 and such other information, if any, with respect to the Company as may be reasonably required in connection with the preparation of the federal or state income tax (or information) returns of such Interest Holder, including a statement depicting each Interest Holder's share of income, gain or loss and any applicable federal or state income tax credits in respect to that fiscal year.

**9.12**    **Tax Matters Partner**. The Manager is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE 10.    DEADLOCK

**10.01**    **Deadlock.** In the event the Members are divided on any issue involving the unanimous vote of the Member's Percentage Interest, and said deadlock lasts for more than thirty (30) days (hereinafter referred to as a "Deadlock") the following shall apply:

**10.02**    **Mediation.** The Members shall attempt to resolve the issue(s) causing the Deadlock through non-binding mediation to be held in Tampa, Florida, or any other location agreed upon by the Members. If the Members are unable to agree on a mediator within ten (10) days of the expiration of the thirty (30) day period referenced in Article 10.01, then such mediator shall be selected by the legal counsel for each Member. The Members shall split equally the costs and expenses of any mediation pursuant to this Article 10.02.

**10.03**    **Binding Arbitration.** In the event the Members do not resolve such Deadlock pursuant to Article 10.02, then such Deadlock shall be resolved by the use of binding arbitration. If the Members shall agree on an independent arbitrator, then each Member shall split equally the costs and expenses of any arbitrator mutually agreed upon. If the Members are unable to agree on an arbitrator within ten (10) business days of the final day of mediation referenced in Article 10.02, the Members agree to submit the matter(s) to arbitration under the commercial arbitration rules of the American Arbitration Association. Such controversy shall be submitted to one (1) arbitrator selected from the panel of arbitrators of the American Arbitration Association. The arbitration shall be held in Bloomington, Florida, unless the Members agree otherwise in writing. The arbitrator shall decide the issue(s) at hand in accordance with the substantive laws of the State of Florida, without regard to conflicts of law principles. The initial filing fee for such arbitration shall be split equally by the Members. Each Member shall be responsible for paying all other fees, costs and expenses incurred by each in connection with the arbitration, including, without limitation, legal and accounting fees and expenses; provided that the arbitrator shall have the discretion to require reimbursement of such fees and expenses to any Member. The arbitrator's decision shall be in writing and shall state the reasons on which it is based. The award shall be final and binding upon the parties Judgment on the award may be entered by any circuit court located in McLean County, Florida or any federal court located in the Central District of Florida, as the case may be.

## ARTICLE 11.    VALUATION

**11.01**    **Agreed Value.** The value of the Membership Interest shall be established by:

---

(a) The affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest, and shall be set forth in Exhibit C to this Operating Agreement (the "Agreed Value"). The Agreed Value shall remain in effect until a new Agreed Value is established by the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest at a Member meeting pursuant to Article 7.01; or

(b) If the Members of the Company fail to establish an Agreed Value as set forth in Section 11.01(a), then the value of the Membership Interest shall be determined by an independent appraiser as mutually selected and agreed to by the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest.   If the Members are unable to unanimously agree on an independent appraiser, then, the Manager shall retain an independent mediator (whom is a duly licensed attorney) to select an independent appraiser. After the retention of the mediator, each Member shall, within seven (7) days thereof, make a written submission to the mediator that: (i) identifies the appraiser selected by the Member; and (ii) identifies the qualifications of the proposed appraiser.  Within twenty-one (21) days of being appointed as a mediator, the mediator shall select an independent appraiser to determine the value of the Membership Interest.  The mediator shall send a written copy of his or her selection to each Member.  Nothing herein shall be interpreted as requiring the mediator to select any of the appraisers identified by the Members; and the mediator is specifically granted the authority to select any independent appraiser whether or not such appraiser is identified by the Members.

## ARTICLE 12.        TRANSFERABILITY

**12.01**   <u>Limitation on Transferability</u>. Subject to the provisions of this Article, an Interest Holder shall have the right to sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration all or any part of their Membership Interest or Economic Interest.

**12.02**   <u>Transfer Notice</u>. If an Interest Holder desires to sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration all or any part of its Membership Interest or Economic Interest (the "Transfer"), such Interest Holder shall give written notification to the Manager and the Members, by certified mail or personal delivery, of his, her or its intention to transfer such interest. The Notice shall set forth the terms and conditions upon which the transfer is being made and identify the proposed purchaser. The Interest Holder must provide notice not less than thirty (30) days before the proposed effective date of the transfer ("Transfer Notice").

**12.03**   <u>Company Right of First Refusal.</u> Upon receipt of the Transfer Notice, the Company shall have the right to purchase the Interest Holder's Membership Interest or Economic Interest on the same terms and conditions identified in the Transfer Notice. The Company shall notify the Interest Holder within fourteen (14) days of receiving the Transfer Notice as to whether the Company will exercise its right of first refusal ("Right of First Refusal Notice"). If the Company exercises its right of first refusal, then the Company and the Interest Holder shall complete the Transfer within fourteen (14) days of the Company providing the Right of First Refusal Notice to the Interest Holder. If the Company does not exercise its right of first refusal, or if the Company does not timely notify the Interest Holder of its desire to exercise its right of first refusal, then, the Members shall have a right of first refusal as set forth in Section 12.04.

**12.04    Member Right of First Refusal**.  If the Company does not exercise its right of first refusal as set forth in Section 12.03, then each Member shall have the right to purchase the Interest Holder's Membership Interest or Economic Interest on the same terms and conditions identified in the Transfer Notice.  If more than one Member exercises their right of first refusal under this Section, then those Members shall collectively purchase the Interest Holder's Membership Interest or Economic Interest in equal parts, or as divided in such other proportions as unanimously agreed to by those Members.  The Members shall notify the Interest Holder within forty-five (45) days of the Company receiving the Transfer Notice as to whether the Members will exercise their right of first refusal ("Members' Right of First Refusal Notice").  If the Member(s) exercise their right of first refusal, then the Member(s) and the Interest Holder shall complete the Transfer within fourteen (14) days of the Member(s) providing the Members' Right of First Refusal Notice to the Interest Holder.  If the Member(s) do not exercise their right of first refusal, or if the Member(s) do not timely notify the Interest Holder of their desire to exercise their right of first refusal, then the Interest Holder shall be entitled to complete the Transfer with the proposed transferee pursuant to and in compliance with the terms and conditions which were originally stated in the Transfer Notice, subject to the provisions of this Article.

**12.05    Involuntary Transfer**.  In the event of: (a) the death of an Interest Holder; (b) a judicial determination that the Interest Holder is disabled and needs the appointment of a guardian or conservator; (c) the dissolution of an Interest Holder who is a corporation; (c) the dissociation of a Member; (d) an Interest Holder executes an assignment for the benefit of creditors; (e) an Interest Holder seeks, consents to, or acquiesces to the appointment of a trustee, receiver, or liquidator of the Interest Holder or of all or substantially all of the Interest Holder's property; (f) a voluntary or involuntary bankruptcy filing of an Interest Holder; and (g) an Interest Holder attempts to make a Prohibited Transfer as that term is defined in Section 12.07; (each an "Involuntary Transfer Event"), then, the Company shall have the right, but not obligation, to purchase the Interest Holder's Membership Interest or Economic Interest at the Agreed Value as established by Article 11 (the "Involuntary Transfer").  The Company shall notify the Interest Holder, or the Interest Holder's Representative, of its intent to complete the Involuntary Transfer within fourteen (14) days of the Involuntary Transfer Event (the "Involuntary Transfer Notice").  The Company and the Interest Holder, or the Interest Holder's Representative, shall complete the Involuntary Transfer within fourteen days of the Company providing the Involuntary Transfer Notice.  If the Company does not exercise its right to the Involuntary Transfer, or if the Company does not timely notify the Interest Holder, or the Interest Holder's Representative, of its desire to exercise its right to the Involuntary Transfer, then, the Interest Holder, or Interest Holder's Representative, shall have the right to sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration all or any part of the Interest Holder's Membership Interest or Economic Interest, subject to the provisions of this Article.

**12.06    Lifetime Gifts**.  Each Member shall be free, to transfer by gift, or otherwise without consideration, all or a portion of their Economic Interest in the Company. A Member may not transfer the Member's Membership Interest, nor may a transferee of an Economic Interest become a Member of the Company.

**12.07    Prohibited Transfers**.  Notwithstanding any other provision herein; each Interest Holder is prohibited from transferring their Membership Interest or Economic Interest to any third party; if such transfer would cause the loss, or otherwise adversely affect, any license held by the Company or a Member of the Company (a "Prohibited Transfer").  In the event an Interest Holder attempts to make a Prohibited Transfer such transfer shall constitute an irrevocable offer on the part of the Interest Holder to sell their Membership Interest or Economic Interest to the Company, and shall be treated as an Involuntary Transfer Event under Section 12.05

**12.08** **Status of Transferee.**  Upon the affirmative vote of Members holding two-thirds (66.7%) of all Percentage Interest, a transferee under this Article shall become a Member of the Company.  As a condition to approving and consenting to the transferee becoming a Member, the remaining Members may require the transferee to: (a) verify the terms and conditions of the Transfer; (b) confirm that the transferee will accept, assume and agree to be subject to and bound by all of the provisions of this Operating Agreement; (c) verify that the Transfer will not change the tax status of the Company as a partnership under the Code; and (d) assure proper compliance with all applicable statutes, including the securities laws and regulations promulgated by the State of Florida and the United States of America.  Absent such an affirmative vote, the transferee will not become a Member of the Company and will not be entitled to participate in the management or business affairs of the Company.  In such a scenario, the status of the transferee under this Operating Agreement and the Act, will be that of an Economic Interest Owner only.

**12.09** **Costs.**  An Interest Holder shall be responsible for all reasonable costs and attorney fees incurred by the Company in evaluating and responding to a proposed Transfer or proposed Involuntary Transfer whether such Transfer or Involuntary Transfer is completed. If an Interest Holder fails to pay such costs and attorney fees, then the Company shall have the right to deduct such reasonable costs and attorney fees from any allocation of Net Profits or distribution to that Interest Holder under Article 9.

## ARTICLE 13.    ADDITIONAL MEMBERS

**13.01** **Additional Members**.  Upon the affirmative vote of Members holding two-thirds (2/3) of all Percentage Interest, any Person may become a Member in the Company by the original issuance by the Company of a Membership Interest to that Person; subject to the terms and conditions contained in this Operating Agreement. No new Members, however, will be entitled to any retroactive allocation of losses, or income or expense deductions incurred by the Company. The Manager, in the Manager's sole discretion, may close the Company books when a new Member is admitted, as though the tax year has then ended, or allocate the losses, income and expense deductions to the new Member in respect to that portion of the tax year which remains after the Member is admitted as a substituted Member.

## ARTICLE 14.    DISSOLUTION

**14.01** **Events of Dissolution**.  The Company will be dissolved when any of the following events occur: (a) upon the affirmative vote of Members holding one hundred percent (100.0%) of all Percentage Interest; (b) upon the occurrence of an event that makes it unlawful for all or substantially all of the business of the Company to be continued; or (c) on application by a Member or a dissociated Member, upon entry of a judicial decree that: (i) the economic purpose of the Company is likely to be unreasonably frustrated; (ii) another Member has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the Company's business with that Member; or (iii) it is not otherwise reasonably practicable to carry on the Company's business in conformity with the Articles of Organization and the Operating Agreement.

**14.02** **Liquidation and Distribution.**

(a) When the Company is dissolved, the Manager will proceed with the timely liquidation of the Company and, in the pursuit of that liquidation, the Manager may sell or otherwise dispose of the property and assets owned by the Company as promptly as practicable.

(b) The proceeds derived by the Manager from the sale or other disposition of the property and assets owned by the Company, or such property and assets if the property and assets are not sold or otherwise disposed of by the Manager, will be distributed in the following order, or, in the order prescribed by the Act if the statutory order of distribution then differs from the provisions of this Operating Agreement: (i) to the payment of all creditors and all debts and liabilities of the Company, other than loans or advances to the Company by the Members or Economic Interest Owners, and the expenses of liquidation; (ii) to the payment of any loans to the Company or advances on behalf of the Company by a Member or an Economic Interest Owner, or compensation owed to the Manager; (iii) to the establishment of any Reserves which the Manager may deem reasonably necessary to satisfy any contingent or unforeseen liabilities or obligations of the Company; and (iv) to the payment of the balance, if any, of the respective Capital Accounts of the Members or any Economic Interest Owners.

(c) At the completion of the liquidation and distribution of the property and assets of the Company, in the manner described in this Operating Agreement, the Company will be deemed to be terminated.

**14.03   Articles of Dissolution.**  When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets of the Company have been distributed, Articles of Dissolution as required by the Act, shall be executed in duplicate and filed with the Florida Secretary of State.

**14.04   Filing of Articles of Dissolution.**  When Articles of Dissolution are filed with the Florida Secretary of State, the existence of the Company will cease, except to the extent otherwise stated in the Act, and the Articles of Organization will be deemed to be cancelled.

**14.05   Return of Capital Contribution and Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of their Capital Contribution. If after the payment or discharge of the debts and liabilities of the Company, the Company's remaining assets are insufficient to return the Capital Contribution of the Members, the Members shall receive a return of their Capital Contributions on a pro rata basis based upon each Member's Percentage Interest

## ARTICLE 15.       MISCELLANEOUS PROVISIONS

**15.01   Notices.**  Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if: (a) either by actual delivery of the notice into the hands of the parties thereunto entitled; (b) by the mailing of the notice in the U.S. mail, certified mail, return receipt requested; (c) sent by nationally recognized, overnight delivery service, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement; or (d) via electronic mail. The notice shall be deemed to be received under subsection (a) on the date of its actual receipt by the party entitled thereto and under subsections (b), (c) and (d) on the date of its mailing or deposit with such delivery service.  The failure or refusal of any party to accept any notice given pursuant to this Article shall be conclusively deemed receipt thereof and knowledge of its contents.  The addresses in Exhibit A will be used if notice is to the Members. The principal place of business will be used if notice is to the Company.

**15.02   Books of Account.**  Proper and complete books of account will be maintained by the Manager at the principal place of business of the Company, and the Manager will cause all transactions relating to the business of the Company to be entered in such books.

**15.03   Applicable Law and Venue.**  This Operating Agreement, and the interpretation of this Operating Agreement, is governed by the laws of the State of Florida, and specifically the Act, as well as the Code, the Treasury Regulations and other relevant statutes of the United States of America. The sole judicial forum and exclusive venue for any dispute arising under, or from, this Agreement shall be McLean County, Florida.

**15.04**   <u>Waiver of Action for Partition</u>.  While the Company remains in effect or is continued, each Member agrees and waives its rights to have any Company property partitioned, or to file a complaint or to institute any suit, action, or proceeding at law or in equity to have any Company property partitioned, and each Member, on behalf of itself, its Representatives, and its assigns hereby waives any such right.

**15.05**   <u>Amendments</u>.  Amendments of this Operating Agreement must be in writing and, except as otherwise stated in this Operating Agreement, must be approved by the affirmative vote of Members holding sixty-seven percent (67.0%) of all Percentage Interest.

**15.06**   <u>Additional Documents</u>.  Each Member agrees to execute such additional statements of interest and ownership, designations and other instruments or documents as may be necessary to comply with the Act or any other law, rules or regulations.

**15.07**   <u>Construction</u>.  Whenever the singular designation is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

**15.08**   <u>Headings</u>.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**15.09**   <u>Default Waivers</u>.  The failure of any party to this Operating Agreement to seek redress in the event of a default or to demand the strict performance of any covenant or condition of this Operating Agreement will not preclude that party from citing a subsequent act, if that act would have originally constituted a default under this Operating Agreement.

**15.10**   <u>Rights and Remedies Cumulative</u>.  The rights and remedies provided by this Operating Agreement are cumulative and the use of anyone right or remedy by any party shall not preclude or waive the right to use any other remedy.  Said rights and remedies are given in addition to any other legal rights the parties may have.

**15.11**   <u>Severability</u>.  If any provision of this Operating Agreement or the application of such provision to any Person or circumstance is invalid, illegal or unenforceable to any extent, the remaining provisions of this Operating Agreement, and the application of this Operating Agreement, will not be affected, and this Operating Agreement will be enforceable to the extent permitted by law.

**15.12**   <u>Successors and Assigns</u>.  Each and all of the covenants, terms and provisions contained in this Operating Agreement are binding on, and inure to the benefit of, the parties executing this Operating Agreement and, to the extent permitted by this Operating Agreement and the Act, their respective Representatives and assigns.

**15.13**   <u>Creditors</u>.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**15.14**   <u>Counterparts</u>. This Operating Agreement may be executed in two or more counterparts, all of which taken together shall be deemed one original.  This Operating Agreement may also be executed and delivered by facsimile signature or by email (in PDF or similar format) and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**15.15**   <u>Integration</u>.  This Operating Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining to such subject matter.  There are no other understandings or agreements between them pertaining to the subject matter hereof.

**15.16**   <u>Interpretation</u>.  In the event an ambiguity or question of intent or interpretation arises as to this Operating Agreement, no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**15.17**   <u>Incorporation of Exhibits</u>. The Exhibits referenced in this Operating Agreement are incorporated herein by reference and made a part hereof.

* * * SIGNATURES TO FOLLOW ON NEXT PAGE * * *

In witness whereof, the Members executed and then delivered this Operating Agreement, effective as of February 18th, 2015, in pursuance of the uses and purposes which are described and contained in this Operating Agreement.

_____                    _____
Bob Talbot, Northern Tier Medical, Inc.                        Date


_____                    _____
Innova HealthCare Services, Inc.                                 Date
By:
Its:


_____                    _____
Munear Kouzbari                                                       Date
By:
Its:


_____                    _____
COO TBD                                                               Date
By:
It's


_____                    _____
Medical Web Experts, LLC                                          Date
By:
Its:


_____                    _____
Investor TBD                                                           Date
By:
Its:

## Exhibit A: Members

| Name and Business Address of Members: | SSN/FEIN: | Form of Contribution: | Initial Capital Contribution: | Membership Units: | Percentage Interest: |
|---|---|---|---|---|---|
| Bob Talbot Northern Tier Medical, Inc. | 04-3020426 | Intangibles | n/a | 115 | 19.17% |
| Innova HealthCare Services, Inc. 415 Hampton Cove Peoria, IL 61607 | 27-3608240 | Intangibles | n/a | 165 | 27.50% |
| Munear Kouzbari | | Intangibles | n/a | 20 | 3.33% |
| COO TBD | | Intangibles | n/a | 10 | 1.67% |
| Medical Web Experts, LLC | | Intangibles | n/a | 40 | 6.67% |
| Investor TBD | | Intangibles | n/a | 250 | 41.67% |

**  **As set forth more fully in the Company's February 18, 2015, Consent Resolution, all membership units for the "TBD – Investor(s)" shall be held by the Company and voted by the Manager until such time as said investor(s) are identified and made parties to the Operating Agreement.**

## Exhibit B: Election of Manager

The undersigned being all of the Members of the Company, have hereby voted for the election of the Managers of the Company pursuant to Article 5.02(b) of the Operating Agreement, the following are the results of said vote:

| Member | Percentage Interest | Vote |
|---|---|---|
| Bob Talbot, Northern Tier Medical, Inc | 19.17% | Bob Talbot |
| Innova HealthCare Services, Inc. | 27.5% | Scott Anderson |
| Munear Kouzbari | 3.33% | Munear Kouzbari |
| COO TBD | 1.67% | Bob Talbot |
| Medical Web Experts, LLC | 6.67% | Bob Talbot |
| Investor TBD | 41.67% | Bob Talbot |

After review of the election results, and it appearing that Bob Talbot received the affirmative vote of Members holding eighty percent (80.0%) of all Percentage Interest, it is hereby determined that Bob Talbot has been elected Manager of the Company in accordance with the provisions of Section 5.02(b).

---

Bob Talbot, Northern Tier Medical, Inc     Date

---

Innova HealthCare Services, Inc.     Date
By:
Its:

---

Munear Kouzbari     Date
By:
Its:

---

COO TBD     Date
By:
Its:

---

Bob Talbot, Manager     Date
Voting the 10 membership units for the
"COO *TBD -- Investor(s)*"
It's

---

Medical Web Experts, LLC     Date
By:
Its:

---

Investor TBD     Date
By:
Its:

_____        _____
Bob Talbot, Manager                     Date
Voting the 250 membership units for the
"Investor *TBD – Investor(s)*"


Acceptance of Election as Manager


_____        _____
Bob Talbot                              Date

## Exhibit C:  Agreed Value

Pursuant to the provisions of Article 11.01(a), the undersigned, being Members holding one hundred percent (100.0%) of all Percentage Interest in the Company, have established the value of the entire one hundred percent Membership Interest of the Company to be: **$2,400,000**. Each Membership Unit shall have a value of $4,000

_____        _____
Bob Talbot, Northern Tier Medical, Inc          Date


_____        _____
Innova HealthCare Services, Inc.                Date
By:
Its:


_____        _____
Munear Kouzbari                                 Date
By:
Its:


_____        _____
COO TBD                                         Date
By:
Its:


_____        _____
Bob Talbot, Manager                             Date
Voting the 10 membership units for the
"COO *TBD -- Investor(s)*"


_____        _____
Medical Web Experts, LLC                        Date
By:
Its:


_____        _____
Investor TBD                                    Date
By:
Its:


_____        _____
Bob Talbot, Manager                             Date
Voting the 250 membership units for the
"Investor *TBD -- Investor(s)*"

# PART D – SUBSCRIPTION DOCUMENTS

## Subscription Agreement

This Subscription Agreement ("Agreement") is entered into by and between MyCareCoach, LLC, a Florida Limited Liability Company ("Company"), and the undersigned Subscriber in the Company ("Subscriber") as of date signed by Company below. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to in the Operating Agreement provided herewith by and among the Manager and the Members identified therein (the "Operating Agreement").

Whereas; Company has been formed as a limited liability company under the laws of the State of Florida by the filing of Articles of Organization with the Florida Secretary of State on _____;

Whereas; the existing Members and the Manager have set out fully in the Operating Agreement their respective rights, obligations and duties with respect to the Company and its assets; and

Whereas; Subscriber wishes to purchase from the Company, and the Company wishes to issue to Subscriber, membership interest in the Company in the form of a number of membership units ("Unit"), each Unit represented by a Capital Contribution of $4,000 and each Subscriber must purchase a minimum of three (3) Units for $12,000.

Now therefore; in consideration of the premises and the mutual covenants contained in this Agreement, the parties agree as follows:

1. **Subscription for Units.**

1.1 <u>Agreement to Sell and Purchase.</u> Subscriber hereby irrevocably agrees to purchase from the Company, and the Company hereby agrees to issue and sell to Subscriber, subject to Section 2.2 (Rejection of Subscription) of this Agreement, the following number of Units:

**Number of Units:** _____   **Total Capital Contribution:** _____

*(The "Purchased Units"), all subject to the terms and conditions set forth in this Agreement.*

1.2 <u>Consideration.</u> In consideration of the issuance and sale of the Purchased Units, Subscriber agrees to make (a) an Initial Capital Contribution to the Company in the manner set forth in the Operating Agreement (the terms of which provision are incorporated herein by reference) and (b) a commitment to make additional capital contributions to the Company as described in the Operating Agreement.

2. **Closing.**

2.1 <u>Closing Date.</u> The Closing of the purchase and sale of the Purchased Units shall occur at a time, date, and place designated by the Company; <u>provided, however,</u> that in no event shall the Closing occur more than thirty (30) days after the execution of this Agreement.

2.2 <u>Rejection of Subscription.</u> At or before the Closing, the Company may, in its sole discretion and for any reason, elect not to accept the subscription of Subscriber, in whole or in part. If the Company rejects such subscription, the Company shall refund to Subscriber all funds submitted by Subscriber to the Company in connection with such rejected subscription.

2.3 <u>Default.</u> If Subscriber fails to perform his obligations hereunder within five (5) days after receipt of notice by the Company to Subscriber of such failure, the Company may, at its sole option: (a) if such failure occurs prior to the Closing, refuse to issue the Purchased Units to Subscriber; or (b) if such failure

occurs after the Closing, result in the reversion of all rights, title and interest in the Purchased Units to the Company and a rescission of the transactions contemplated hereby.

2.4 <u>Failure of Closing to Occur.</u> The Company shall have no liability to Subscriber for (a) the failure of the Closing to occur or (b) its failure to issue the Purchased Units to Subscriber.

2.5 <u>Obligations of Subscriber.</u> At the Closing, Subscriber shall execute the Operating Agreement and such other documents as are deemed by the Company to be appropriate, advisable or necessary to consummate the transactions contemplated hereby and thereby.

2.6 <u>Subscription Irrevocable.</u> Except as provided under applicable state securities laws, this subscription is and shall be irrevocable on the part of Subscriber.

3. **Representation and Warranties of Subscriber.**

Subscriber hereby represents and warrants to the Company as follows:

3.1 <u>No Conflicts.</u> The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, violate any terms of any material contractual restriction or commitment of any kind or character to which Subscriber is a party or by which Subscriber is bound.

3.2 <u>Risk of Loss.</u> Subscriber is able to bear the substantial economic risks of an investment in the Company and to sustain a complete loss of such investment. Subscriber recognizes that the acquisition of the Purchased Units involves a high degree of risk. Subscriber is cognizant of and understands all of the risks related to the purchase of the Units, including those set forth in Section 3.7 (Restrictions on Transfer) of this Agreement pertaining to transferability. Subscriber has adequate net worth and means of providing for his current needs and possible personal contingencies and has no need for liquidity in this investment. Subscriber's commitment to investments which are not readily marketable is not disproportionate to his net worth and his acquisition of the Purchased Units will not cause his overall commitment to such investments to become excessive.   <u>Subscriber shall complete the attached Purchaser Questionnaire</u> which shall be used to determine whether Subscriber is an "accredited investor".

3.3 <u>Access.</u> Subscriber acknowledges that all documents, records and books pertaining to this investment have been made available for inspection by him, his counsel, and his accountants. Counsel and accountants for Subscriber, and Subscriber himself, have had the opportunity to obtain any additional information necessary to verify the accuracy of the contents of the documents presented to them, and to confer with and to ask questions of, and receive answers from, representatives of the Company or persons authorized to act on its behalf concerning the terms and conditions of this investment and any additional information requested by Subscriber or his representatives. In evaluating the suitability of this investment in the Company, Subscriber has not relied upon any representations or other information (whether oral or written) other than as set forth in any documents or answers to questions furnished by the Company. Subscriber is making this investment without being furnished any offering literature other than the documents or answers to questions described above.

3.4 <u>Investment Intent.</u> The Purchased Units are being acquired by Subscriber for the account of Subscriber, for investment purposes only, and not with a view to, or in connection with, any resale or distribution thereof. Subscriber has no contract, undertaking, understanding, agreement or arrangement, formal or informal with any person or entity to sell, transfer or pledge to any person or entity all or any part of the Purchased Units, any interest therein or any rights thereto, and Subscriber has no present plans to enter into any such contract, undertaking, agreement or arrangement.

3.5 <u>Reliance on Representations.</u> Subscriber understands that no federal or state agency has passed on or made any recommendation or endorsement of the Units. Subscriber further understands that the Company, in offering the Purchased Units for sale to Subscriber, is relying on the truth and accuracy of the representations, declarations, and warranties made by Subscriber herein and in the Purchaser

Questionnaire completed, executed and delivered by Subscriber to the Company contemporaneously herewith.

3.6 <u>No Registration.</u> Subscriber acknowledges that, because the Units have not been registered under the Securities Act of 1933 (the "Securities Act"), and because the Company has no obligation to effect such registration, Subscriber shall continue to bear the economic risk of his investment in the Purchased Units for an indefinite period.

3.7 <u>Restrictions on Transfer.</u> Subscriber agrees that he will not sell or otherwise transfer the Purchased Units other than in accordance with the terms and conditions of the Operating Agreement. It is understood that the Units cannot be liquidated easily, that no public or other market exists for the Units, and that no such market is expected to develop. Subscriber is aware that, because the Purchased Units have not been registered under the Securities Act or applicable state securities laws, any resale inconsistent with the Securities Act or applicable state securities laws may create liability on Subscriber's part or the part of the Company, and agrees not to assign, sell, pledge, transfer or otherwise dispose of the Units unless they are registered under the Securities Act and applicable state securities laws, or an opinion of counsel satisfactory to the Company is given to the Company that such registration is not required. Subscriber is aware that the Company will impress on the back of any certificate representing Units a legend substantially as follows:

> These Units have not been registered under the Securities Act of 1933 or applicable state securities laws. They may not be offered or transferred by sale, assignment, pledge or otherwise unless (i) a registration statement for the Units under the Securities Act and applicable state securities laws is in effect or (ii) the Company has received an opinion of counsel satisfactory to the Company to the effect that such registration is not required.

3.8 <u>Sophistication.</u> Subscriber possesses a sufficient degree of sophistication, knowledge, and experience in financial and business matters such that he is capable of evaluating the merits and risks of acquiring the Purchased Units.

3.9 <u>No Oral Representations.</u> No person representing the Company or purporting to do so has made any oral representation or warranty to Subscriber which is inconsistent with the information provided in writing to him. Subscriber agrees that he has not relied and shall not rely on any such representation or warranty in connection with any decision to acquire the Purchased Units.

3.10 <u>Execution on Behalf of Certain Entities.</u> If this Agreement is executed on behalf of a partnership, trust, corporation or other entity, the undersigned has been duly authorized to execute and deliver this Agreement and all other documents and instruments (if any) executed and delivered on behalf of such entity in connection with this subscription for the Purchased Units.

3.11 <u>Brokers.</u> No broker, finder or intermediary has been paid or is entitled to a fee or commission from or by Subscriber in connection with the purchase of the Purchased Units nor is Subscriber entitled to or will accept any such fee or commission.

3.12 <u>Indemnification.</u> Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties contained in this Agreement, and hereby agrees to indemnify and hold harmless the Company and any affiliate of the Company, and the officers, members, managers, associates, agents and employees of the Company and their affiliates, and any professional advisers to any of the above parties, from and against any and all loss, damage or liability (including costs and reasonable attorneys' fees) due to or arising out of a breach of any representation, warranty or acknowledgement of Subscriber or failure to fulfill any obligation of Subscriber, whether contained in this Agreement or in any other document completed as part of the sale of the Purchased Units to Subscriber, or arising out of the sale or distribution by Subscriber of any securities in violation of the Securities Act or any applicable state securities laws. Notwithstanding any of the representations, warranties, acknowledgements or agreements made herein by Subscriber, Subscriber does not hereby or in any other manner waive any rights granted to him under federal or state securities laws.

3.13 <u>Subject to Operating Agreement.</u> The Units subscribed for herein shall at all times be subject to the terms of the Operating Agreement.

3.14 <u>Confidentiality.</u> Subscriber hereby agrees, on behalf of himself and his designated representative, if any, to keep confidential at all times any nonpublic information which such persons may acquire concerning the Company pursuant to this Agreement or otherwise. Nothing in this Section 3.14 (Confidentiality) shall be construed to impose a confidentiality obligation on such persons in connection with (a) any information already possessed by such persons which such persons acquired from sources other than the Company, or (b) any matter which is at the date of this Agreement, or thereafter becomes, public knowledge through no act or failure to act by the undersigned or designated representatives of Subscriber.

3.15 <u>Survival.</u> The foregoing representations and warranties of Subscriber shall survive the Closing. Subscriber represents and warrants that the representations, warranties and acknowledgements set forth above are true and accurate as of the date hereof and as of the Closing. If in any respect such representations and warranties shall not be true prior to the Closing, the undersigned will give prompt written notice of such fact to the Company.

## 4. General.

4.1 <u>Governing Law.</u> This Agreement shall be governed by and construed under applicable federal law and the laws of the State of Florida. If there is any suit, claim, action or proceeding arising out of or relating to this Agreement, the parties expressly agree that jurisdiction and venue shall be properly fixed in the State or Federal Courts of McLean County, Florida.

4.2 <u>Successors and Assigns.</u> Except as otherwise expressly provided in this Agreement, this Agreement will be binding on, and will inure to the benefit of, the successors and permitted assigns of the parties to this Agreement. Subscriber may not assign this Agreement without written approval by Company, which approval may be withheld by Company for any reason whatsoever. Nothing in this Agreement is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights or obligations under or by reason of this Agreement, except as expressly provided in this Agreement.

4.3 <u>Notices.</u> All notices and other communications required or permitted hereunder will be in writing and will be delivered by hand or sent by overnight courier, fax or e-mail to:

    <u>If to the Company:</u>

    This section should be filled out with Company's address and contact information.

**To Company:**                                                **To Subscriber:**

**MyCareCoach, LLC**                              _____
**Attn:  Mr. Bob Talbot**                          _____
                                            _____
                                            _____

    Each party may furnish an address substituting for the address given above by giving notice to the other parties in the manner prescribed by this Section 4.3. All notices and other communications will be deemed to have been given upon actual receipt by (or tender to and rejection by) the intended recipient or any other person at the specified address of the intended recipient.

4.4 <u>Severability.</u> In the event that any provision of this Agreement is held to be unenforceable under applicable law, this Agreement will continue in full force and effect without such provision and will be enforceable in accordance with its terms.

4.5 <u>Construction.</u> The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) references to the plural include the singular, the singular the plural, and the part the whole, (b) references to one gender include all genders, (c) "or" has the inclusive meaning frequently identified with the phrase "and/or," (d) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation," and (e) references to "hereunder," "herein" or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation or agreement, including this Agreement, shall be deemed to include such statute, rule, regulation or agreement as it may be modified, varied, amended or supplemented from time to time.

4.6 <u>Entire Agreement.</u> This Agreement contains the entire agreement and understanding between the parties and supersedes all prior agreements, negotiations, representations or understandings, whether written or oral, with respect to the subject matter of this Agreement. Subscriber represents and warrants that there is no statement, representation, covenant, inducement or promise, whether written or oral, that has been made by the Company which is not included in this Agreement. Subscriber further represents and warrants that in entering into this Agreement, Subscriber is relying solely upon the information contained in this Agreement and not in reliance upon any other information.

4.7 <u>Amendment and Waiver.</u> This Agreement may be amended only by a written agreement executed by the parties hereto. No provision of this Agreement may be waived except by a written document executed by the party entitled to the benefits of the provision. No waiver of a provision will be deemed to be or will constitute a waiver of any other provision of this Agreement. A waiver will be effective only in the specific instance and for the purpose for which it was given, and will not constitute a continuing waiver.

4.8 <u>Counterparts.</u> This Agreement may be executed and delivered by facsimile or email (PDF format) and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Subscription Agreement as of the date first written above.

<u>COMPANY</u>:

Signature: _____

Name: _____

Title: _____

Dated: _____

<u>SUBSCRIBER</u>:

Signature: _____

Name: _____

Title: _____

Dated: _____

Number of Units: _____

Amount of Capital Contribution: _____

SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT

## PURCHASER QUESTIONNAIRE

The purpose of this Questionnaire is to provide information as to the suitability of subscribers pursuant to the requirements of Section 4(2) of the Securities Act of 1993, as amended (the "Act"), as interpreted by Regulation D. The membership units of MyCareCoach, LLC, a Florida Limited Liability Company, will not be registered under the Act in reliance upon the exemption from registration provided by Section 4(2) of the Act and Regulation D.

All subscribers must complete PARTS A and D.

All subscribers who are natural persons must complete PART B.

All subscribers other than natural persons must complete PART C.

**If the subscriber is a CORPORATION, Parts A, C and D must be completed by the authorized officer making the investment decision of behalf of the corporation. If the subscriber is a TRUST, Parts A, C and D must be completed by the trustee on behalf of the trust, and each grantor of the trust must complete a copy of this Questionnaire, Parts A, B and D as an individual (natural person). If the subscriber is a PARTNERSHIP, each partner must complete a copy of this Questionnaire, Parts A, B and D, as an individual (natural person), and one partner must complete Parts A, C and D on behalf of the partnership.**

If the subscriber is a trust for a pension or profit sharing plan where a SEGREGATED ACCOUNT is provided for each plan participant and such participant has the power to direct and is directing the investment choice (to the extent of voluntary contributions and vested employer contributions), the PLAN PARTICIPANT must complete Parts A, B and D as an individual (natural person).

**ALL INFORMATION DISCLOSED IN THIS QUESTIONNAIRE WILL BE MAINTAINED IN STRICT CONFIDENCE.** However, by signing this Questionnaire, you agree that the Company may present this Questionnaire to such persons or governmental agencies as it deems appropriate to establish an exemption from registration under the Act or applicable state securities laws.

### PART A

*(To be completed by all subscribers)*

Name of Subscriber: _____

INITIAL _____

I am not relying upon the advice of a Purchaser Representative in making any investment decision to purchase membership units in MyCareCoach, LLC. I am an accredited investor as defined in Regulation D, Rule 501(a) under the Securities Act of 1933 and I have sufficient knowledge and experience in financial business matters to be capable of evaluating the merits and risks of this offering and making an informed investment decision. I am offering as evidence of my knowledge and experience in these matters the information indicated below.

### PART B

*(To be completed only by subscribers who are natural individuals)*

1.    **Financial Information**

(a)  Do you have adequate means of providing for your current needs and personal contingencies and have no need for liquidity in your investment?

Yes _____ No _____

(b)  Are you able to bear the economic risk of an investment in the Company of the size contemplated, including a complete loss of your investment?

Yes _____ No _____

**2.      Status as Accredited Investor**

The following questions establish whether or not you are an "accredited investor" as that term is defined in Regulation D by virtue of meeting any of the following criteria.

Does your net worth inclusive of home, furnishings and automobile(s) or the joint net worth of you and your spouse (if any), exceed $1,000,000 at the present time?

Yes _____ No _____

(a)  (1) Did your individual income in each of the last two years exceed $200,000 or did your joint income with your spouse in each of the last two years exceed, (2) do you expect to have this year an individual income in excess of $200,000 or joint income with your spouse in excess of $300,000?
(For this purpose, income is computed by adding the following items to adjusted gross income as computed for federal income tax purposes (but not including any amounts attributable to a spouse or property owned by a spouse): any deductions for long-term capital gain or depletion, any exclusion of interest earned on tax-exempt bonds, any losses allocated from limited partnership, amounts contributed to an IRA or Keogh retirement plan and alimony payments.)

Yes _____ No _____

**3.      If your answer to 2(a) and 2(b) is "NO", does your net worth (excluding your home, furnishings and autos) or does the joint net worth of you and your spouse equal at least ten times the amount of your subscription?**

Yes _____ No _____

**4.      Answer only if your answer to 2(a) or 2(b) is "NO."**

My gross income (individually or jointly with spouse) from all sources for 2014 was $_____

My estimated gross income (individually or jointly with spouse) from all sources for 2015 is $_____

**5.      Have you previously made one or more investments of this magnitude in newly formed companies or companies carrying similar risks?**

Yes _____ No _____

**6.      If your answer to question 5 is "NO", please describe for each of at least three of your investments in at least the amount for which you are subscribing:**

- the name of the business entity in which you invested;
- the type of security you purchased (e.g., stock, limited liability company interest, partnership interest, etc.);
- the field of business in which the business entity operates;
- the date of your investment;
- the amount of your investment;
- whether or not you used a purchaser's representative to evaluate the investment.

**PART C**

*(To be completed only by subscribers other than natural persons)*

**1.      General Information**

(a)  Type of institution (bank, insurance company, Business Corporation, pension plan, partnership, trust, etc.

_____

(b)  Date of formation: _____

**2.**      **Accredited Investor Status**

Is the subscriber an "accredited investor" as that term is defined in Regulation D under the Securities Act of 1933 (the "Act") by virtue of being any of the following?

(a) A bank as defined in Section 3(a)(2) of Act or a savings and loan association or other institution as defined in Section 3(a)(2) of the Act, whether acting in its individual or a fiduciary capacity?

Yes _____ No _____

(b) A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934?

Yes _____ No _____

(c) An insurance company as defined in Section 2(13) of the Act?

Yes _____ No _____

(d) An investment company registered under the Investment Company Act of 1940?

Yes _____ No _____

(e) A business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940?

Yes _____ No _____

(f) A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958?

Yes _____ No _____

(g) An employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 for which the investment decision is being made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company or registered investment advisor, or if the employee benefit plant has total assets in excess of $5,000,000, or if a self-directed plan, with investment decisions made solely by persons who are "accredited investors"?

Yes _____ No _____

(h) A private business developed company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940?

Yes _____ No _____

(i) An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000?

Yes _____ No _____

(j) A trust, with total assets in excess of $5,000,000 not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D under the Act?

Yes _____ No _____

(k) An entity, all of the equity owners of which are "accredited investors"?

Yes _____ No _____

## PART D

*(To be completed by **all subscribers**) [Initial on each line.]*

_____ (a) The Purchaser Questionnaire is true, complete and accurate and may be relied upon by the Company and its managers and officers in determining my suitability as a purchaser of membership units in MyCareCoach, LLC;

_____ (b) I understand that a false representation may constitute a violation of law, and that any person who suffers damage as a result of a false representation may have a claim against me for damages; and

_____ (c) I will notify the Company immediately of any material change in any of such information occurring prior to the acceptance of my subscription.

**IN WITNESS WHEREOF**, I have initialed the statements above and executed this Purchaser Questionnaire.


Date: _____


_____
Name of Investor (Individual or Entity) [Type or Print]


_____
Witness:


_____
Signature of Investor or Authorized Representative of Entity


_____
Title (If Authorized Representative)

### Agreement to Accede to the Operating Agreement of

### MyCareCoach, LLC

This Agreement to accede to the Operating Agreement of MyCareCoach, LLC, and ("Agreement") is made between the individual or entity named below ("Subscriber"), and MyCareCoach, LLC ("MyCareCoach"), a Florida Limited Liability Company.

Subscriber desires to become a member of MyCareCoach and party to the Operating Agreement of MyCareCoach dated February 18, 2015 (the "Operating Agreement"), subject to acceptance by MyCareCoach of Subscriber's subscription to the membership units offered by MyCareCoach's Subscription Agreement (the "Subscription"). Acceptance by MyCareCoach of the Subscription shall constitute approval of Subscriber's membership in MyCareCoach.

Now, therefore, in consideration of the foregoing, of the mutual agreements below, and of the admission of Subscriber to membership in MyCareCoach, Subscriber and MyCareCoach agree as follows:

Subscriber represents and warrants to MyCareCoach that Subscriber has received a copy of the Operating Agreement, has reviewed the same, understands its contents, has had the opportunity to have the Operating Agreement reviewed by and explained to Subscriber by a lawyer of Subscriber's choice, has had the opportunity to ask any questions of MyCareCoach Subscriber wishes regarding the Operating Agreement and has received answers satisfactory to Subscriber in each case.

Subject to acceptance by MyCareCoach of the Subscription, Subscriber hereby accedes to, and agrees to and accepts all of the provisions of and obligations of a Member under, and becomes party to, the Operating Agreement.

MyCareCoach hereby acknowledges the admission of Subscriber as a Member of MyCareCoach.

In witness whereof, Subscriber has executed and delivered this Agreement or caused its execution and delivery by its agent duly authorized for such purpose, and MyCareCoach has caused the execution and delivery of this Agreement by its Manager duly authorized for such purpose, effective the date of execution of this Agreement by MyCareCoach.

MyCareCoach, LLC

_____
Name of Subscriber [type or print]

By: _____
_____     Bob Talbot, Manager
Signature of Subscriber or
Authorized Representative of Entity

Date: _____
_____
Title (if Authorized Representative)